**COMMONWEALTH of KENTUCKY, Plaintiff–Appellant,**

v.

**Larry A. LONG, Defendant–Appellee.**

**No. 86–5842.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 3, 1987.

Decided Jan. 21, 1988.

L.J. Hollenbach, III, William C. Grimes (argued), Aleta A. Bolte, Louisville, Ky., for plaintiff-appellant.

Larry S. Roberts, Lexington, Ky., C. Cleveland Gambill (argued), U.S. Atty., Louisville, Ky., for defendant-appellee.

Before LIVELY, Chief Judge, KEITH, Circuit Judge, and DOWD, District Judge.*

DOWD, District Judge.

The issue in this case is whether the Supremacy Clause of the United States Constitution requires that a state's indictment of a federal agent be dismissed before trial, absent an affirmative showing by the state that facts are in dispute as to whether the agent committed the crime within the necessary and proper scope of his federal duties. We hold that the Supremacy Clause does so require, and we affirm the judgment of the district court dismissing the indictment in this case. 637 F.Supp. 1150.

The proceedings below are more comprehensible when presented in the following chronological format.[1]

## THE INDICTMENT AND SUBSEQUENT REMOVAL TO FEDERAL COURT

On January 22, 1986, the appellant, Commonwealth of Kentucky, returned an indictment for burglary against the appellee Larry Long, an agent for the Federal Bureau of Investigation. The indictment contained two counts as follows:

### COUNT ONE

That during the period March and April, 1979, in Jefferson County, Kentucky, the above named defendant, Larry A. Long, alone or in complicity, committed the offense of Burglary in the Third Degree by knowingly and unlawfully entering or remaining in a building located

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. The peculiar state of the record is critical to our holding, so the essential components of that record are set forth in considerable detail to assist in the analysis.

at 1357 Gardiner Lane with intent to commit a crime.

## COUNT TWO

That on or about the 25th or 26th day of August, 1979, in Jefferson County, Kentucky, the above named defendant, Larry A. Long, alone or in complicity, committed the offense of Burglary in the Third Degree by knowingly and unlawfully entering or remaining in a building located at 9820 Bluegrass Parkway with intent to commit a crime.

The defendant Long then removed the case to federal court, invoking the provisions of 28 U.S.C. § 1442(a)(1), which state:

(a) A civil action or criminal prosecution commenced in a State court against any of the following persons may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

(1) Any officer of the United States or any agency thereof, or person acting under him, for any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

In asserting his right to remove the case under 28 U.S.C. § 1442(a)(1), defendant Long alleged in his petition for removal that he "is an officer with the Federal Bureau of Investigation and was acting under color of such office and within the scope of his employment as an employee of the United States in pursuing the apprehension of persons engaged in criminal activities."

Defendant Long attached to the removal petition a copy of the indictment and his own affidavit, which states in its entirety as follows:

Comes the Affiant, LARRY A. LONG, Defendant in Action No. 86–CR–0107–11, which is presently pending in the Jefferson Circuit Court, and states as follows:

I became an agent with the Federal Bureau of Investigation in November 1968. I was assigned to the Louisville office in September 1977. In 1979, I became acquainted with Delane Colvin and subsequently developed a relationship with him as a person who assisted the FBI in the role of an informant. Colvin provided me with extensive information of criminal activity which involved other persons and with whom, Colvin advised, he had close contact. The information provided by Colvin related in part to the burglaries with which I am charged in Counts One and Two of the Indictment, which is attached to the Petition herein. I was given information by Colvin about burglaries and, while acting totally within the scope of my responsibilities as an agent of the Federal Bureau of Investigation, I was actively pursuing the apprehension of individuals who were involved with the interstate transportation and sale of stolen property. At no time did I ever direct or instruct any person to commit any crime, and in particular, the offenses charged in the Indictment. I was made aware by Colvin of crimes both having been committed and going to occur at future times. I believed then that I was acting under the express authority of the attorney general's guidelines in the use of informants, which were in effect at the time of my relationship with Colvin.

Following removal, the U.S. Attorney entered his appearance on behalf of Agent Long. Pursuant to 28 U.S.C. § 1446(c)(5),[2] the district court then scheduled an evidentiary hearing on the removal petition, but upon the parties' agreement that such a hearing was not necessary, the court proceeded to grant the removal petition. The

---

**2.** 28 U.S.C. § 1446(c)(5) states:
If the United States district court does not order the summary dismissal of such petition [for removal of a criminal prosecution], it shall order an evidentiary hearing to be held promptly and after such hearing shall make

such disposition of the petition as justice shall require. If the United States district court determines that such petition shall be granted, it shall so notify the State court in which prosecution is pending, which shall proceed no further.

Commonwealth does not challenge that ruling, which was rendered after the following discussion took place:

THE COURT: All right. What do you envision, Mr. Gambill or Mr. Roberts, as to what, what this evidenciary [sic] hearing that subsection (c)(5) talks about, or whether anybody wants one, frankly? These cases being removed are so rare that—

MR. GRIMES [counsel for the Commonwealth of Kentucky]: Judge, if I may.

THE COURT: Yes, sir.

MR. GRIMES: I have had the opportunity to talk with Mr. Gambill [U.S. Attorney] and Mr. Roberts [counsel for Larry Long]. And we are basically in agreement as far as 1446. I am not here to stand and say, well, we disagree. I think it's almost mandatory. But I feel the Court should be aware that 1447, and I was talking about note 3.

THE COURT: Okay.

MR. GRIMES: And I have it specifically marked but not by your page, I had to take it out of another book.

THE COURT: Okay.

MR. GRIMES: You know, our contention is if it couldn't have initially been in federal court, it should be remanded. And then we would have another hearing to remove it. And I would basically just try to save some time. This is, to my knowledge, this is the first time a hearing has been held in Louisville, Kentucky, in a matter like this. And I am basically trying to sift things out in order as early as I can, and that we can resolve these matters as reasonably and as quickly as possible.

THE COURT: It certainly should be. I agree with you. You don't make any issue under 1446?

MR. GRIMES: No, sir. We are really not. I don't think we even need to have an evidenciary [sic] hearing on that, that part of it.

THE COURT: Do you agree with that, Mr. Gambill?

MR. GAMBILL: I am happy to accept the stipulation, if they are willing to agree to that. We are prepared to put on evidence to show that Mr. Long was in fact at this time, at the time alleged, a Special Agent of the Federal Bureau of Investigation; at that time he was engaged in certain kinds of investigations and he had certain contact with a man named Mr. Red Colvin, and that at the time he was within the scope of his employment. But we would be happy to accept the concession by the Commonwealth of Kentucky that there is no issue about that.

THE COURT: Okay. So I gather that you don't make any issue of those facts that he has recited?

MR. GRIMES: That's correct, Your Honor.

### THE MOTION TO DISMISS

Following the granting of the removal petition, the defendant Long and the United States on his behalf filed a motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, which states in relevant part as follows: *Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.*

In the briefing papers supporting the motion, the defense asserted that any alleged crime Agent Long had committed was accomplished within the necessary and proper scope of his duties as an FBI agent, and that even if Agent Long had displayed poor judgment, the Supremacy Clause of the United States Constitution required dismissal of the indictment.

We note that in moving to dismiss, the defense conceded that Delane "Red" Colvin was one of Agent Long's informants; that Colvin was the informant involved in the two burglaries charged in Long's indictment; that Colvin informed Long of those burglaries; and that Long approved Colvin's participation in the burglaries. The defense asserted further, however, that Agent Long "believed [Colvin's participation in the burglaries] to be for the purpose of obtaining further information

as part of the ongoing investigation into such crimes."

In opposing the motion to dismiss the indictment, the Commonwealth challenged what it characterized as the "assertion of innocent error." The Commonwealth took the following position in its briefing papers:

The protection of the Supremacy Clause cannot be made available to the defendant, Larry Long, as his actions do not support innocent error, but rather indicate that he violated Agency guidelines and supervisory trust at the expense of private entities and for his own personal gain and enhancement within the Federal Bureau of Investigation.

### EVIDENTIARY HEARING ON THE MOTION TO DISMISS

On May 30, 1986, the district court conducted an evidentiary hearing on the motion to dismiss the indictment. During a preliminary side bar conference among counsel and the Court, counsel for the Commonwealth handed up a bill of particulars which was not actually filed until June 3, 1986. In the bill of particulars, the Commonwealth alleged the following:

1. Between 1979 and 1981, Larry Long, while employed as a Federal Bureau of Investigation agent, used an informant, Delane Colvin, to commit burglaries at at least two locations in Jefferson County, Kentucky. At Larry Long's direction, Delane Colvin initiated a conspiracy to commit a burglary, performed criminal acts by stealing a truck and truck parts, and directed others to perform criminal acts. Delane Colvin was acting not only at Long's direction, but with Long's approval and full knowledge of the extent of the criminal acts being performed. Colvin was permitted by the Federal Bureau of Investigation to retain the profits from his marketing of a stolen truck and truck parts. In fact, in both burglaries set out below, Long's "informant" was the principal actor, initiating and completing the crimes.

In early 1979, Long was introduced to Delane Colvin. Sometime later, Colvin relayed information to Larry Long that a California dealer was willing to purchase stolen trucks. Long instructed Colving [sic] to proceed with obtaining a stolen truck.

Colvin, along with Eddie Dupin, discussed the operation with Long, and obtained the keys for a new 1978 Ford GL900 cabover truck, which was owned by Summer–Hermann Ford (now Allstate Ford) in Louisville, Kentucky. Larry Long approved the strategy and provided expense money to Colvin and Dupin for the trip to California. On May 15, 1979, Delane Colvin, Eddie Dupin, and Tony Adams stole the 1978 Ford truck from the Summer–Hermann dealership. Ed Kendall set up the fencing operation. One of the men entered the truck yard, and drove the truck off the lot. Colvin and Dupin drove the truck to California. Colvin alone sold the stolen truck to the California dealer, Travis McAdams, for $6,500.00. Eddie Dupin received $1,000.00 and the third man $500.00. Colvin retained the rest, $5,000.00. The Federal Bureau of Investigation failed to arrest the dealer or to recover the truck.

In August, 1979, Colvin told Long of another chance to sell stolen truck parts to the same California dealer. Long instructed Colvin to continue with the operation. Long approved the strategy. Colvin obtained the keys to another Jefferson County business, Cummins Kentuckiana (now Cummins Cumberland, Inc.), located in Jeffersontown, Kentucky. On August 24, 1979, Colvin attempted a break-in, by getting as far as the parts department at Cummins, but failed to complete the burglary due to a missing key. On August 25, 1979, Colvin reported the failed operation to Long, and asked Long for assistance in the form of Long standing as a "look out" in the event local law enforcement officials arrived. On the evening of August 25, 1979, Colvin and another accomplice stole a van from Cummins Kentuckiana, loaded with $50,000.00 worth of Cummins parts, including injectors, fuel pumps, and turbo chargers. Long instructed Colvin to "lie low" until the attention to the break-in subsided.

Cummins Regional Vice President, Rip Nichols, reported the break-in, and the rumors that Delane Colvin had sold some of the Cummins stolen parts in the Louisville area, to the Federal Bureau of Investigation, but the Federal Bureau of Investigation declined to act on this report. In fact, Long never acknowledged he knew Colvin, or that he was aware of the crime.

The local Jeffersontown police recovered the stolen van. Long, however, reported no leads, and provided no assistance to the local authorities. In fact, a misleading, and false report was made on the case to the police. Later, Colvin met in California with their Federal Bureau of Investigation contact, Agent Hinderacker, who became suspicious of the origin of the parts, and the operation in general. Hinderacker refused to have anything to do with the operation. Colvin contacted Long, relaying the difficulty he was having. Colvin sold the parts, but no money was recovered, and no arrests were ever made.

In all the above instances, Long failed to apprise his superiors of the operations he was directing. Long received no authorizations from his superiors, and failed to make accurate reports of either of these operations in his files. Additionally, Long used his dealings with Colvin to advance his position within the agency.

The hearing then proceeded. The defense called Agent Long's informant, Delane "Red" Colvin, and Colvin's alleged accomplice, Eddie Dupin, who both exercised their Fifth Amendment rights not to testify.

The defense also called three witnesses, all of whom were present or former FBI officers. The three FBI witnesses were Virgil Young, Theodore Hinderaker, and John Collinwood who, aside from Colvin and Dupin, were the only witnesses who testified at the hearing. Agent Long did not testify; the Commonwealth called no

witnesses; and the record is completely devoid of any evidentiary submission as to what it was that Colvin accused Long of doing. Following is a summary of the testimony of the three FBI witnesses called by the defense.

## A) VIRGIL YOUNG'S TESTMONY.

At the time of the hearing, Virgil Young was assigned to FBI headquarters as Assistant Section Chief and Unit Chief of the Criminal Informant and Witness Security Programs Unit. At the time of the FBI investigation of Agent Long's involvement with Mr. Colvin, Virgil Young was Unit Chief of the FBI's Informant Unit, and he coordinated for his division the FBI's inquiry into the allegations against Agent Long.

Agent Young testified that during the time period in question, i.e., 1979, the FBI had in effect a set of guidelines, known as the "Levi Guidelines," [3] concerning the FBI's policy on the use of informants. Agent Young testified that the Levi Guidelines were unclear in many respects, with the result that a great deal of discretion was given to individual agents. The following testimony of Agent Young is illustrative:

Q. Could you give the Court and the Commonwealth an example of where they were not clear?

A. Well, one area I think is in the instructions that had to be given to every informant that the FBI uses. One of those instructions is that the informant is to be told that he or she is not to engage in any illegal activity unless they are authorized to do so by the FBI.

Q. All right. And what was unclear about that?

A. Well, it's unclear as to who in the FBI can authorize that participation. No where in the guidelines does it say that a particular agent can authorize it or can't authorize it, nor does it say that that

---

**3.** The "Levi Guidelines" were named after then Attorney General Edwin H. Levi, who signed them in December of 1976. Agent Young testified that those guidelines were superseded in December of 1980 when Attorney General Civiletti issued a new set of more specific guidelines on the use of informants.

authorization required by a special agent in charge or any other specific individual.

Q. Let me ask you this. Assuming that Mr. Long was a supervisor or an acting supervisor or relief supervisor or just merely a regular agent, could he have authorized the participation by an informant in a crime in 1979?

A. According to these guidelines, he could. Now, I might add that's one of the areas that was clarified in the Civiletti guidelines.

Q. But in 1979 would Mr. Long or any other agent have had to seek the approval of a supervising agent in order to authorize participation in the crime?

A. Not to be in conformance with the Levi guidelines.

Q. Will you basically describe your experience with informants, what kind of people are they?

A. Informants are people that generally are involved in criminal activities themselves or they are people who associate with people involved in criminal activities or some way knowledgeable of criminal activities.

Q. Now, with respect—I will ask you if you would please, Mr. Young, turn to page 3 of the guidelines, and if you will, look at number C1, under no circumstances shall the FBI take any action to conceal a crime by one of its informants. What does that mean?

A. This is another area that I think is unclear in the Levi guidelines. And I think it's open to interpretation here. My own interpretation of this is that the FBI shall not try to conceal a criminal activity which was unauthorized by the FBI.

Q. All right. Unauthorized crime, what about a crime that had been authorized, participation in a crime which had been authorized?

A. Well, at that point it comes down to what the word concealed means. I take the word concealed to mean active concealment. But again, that is a word that is open to interpretation and no where else in the guidelines is it clarified.

Q. What about failure to tell someone, including another police officer of another agency, just a failure to tell them or a withholding of information of a crime which had been authorized or participation in a crime which had been authorized, would that be a violation of these guidelines?

A. Not the way I would interpret it.

Under the Levi Guidelines, Young testified, an individual agent such as Agent Long could authorize an informant to participate in criminal activity, but could not authorize an informant to initiate criminal activity. Young testified that his review of the investigative files showed that "to my knowledge, Agent Long did not attempt to authorize [Colvin] to initiate crimes."

Agent Young testified that the FBI's ultimate conclusion as to Agent Long's conduct was that, although Agent Long had violated internal FBI rules and regulations concerning proper documentation of informant contacts, Agent Long had not violated the Levi guidelines on the use of informants.

### B) THEODORE HINDERAKER'S TESTIMONY.

The second FBI witness, Theodore Hinderaker, had been an FBI agent for 28 years, from 1951 through December of 1979. In the spring and summer of 1979 he was stationed in Palm Springs, California as the senior resident agent. He testified that he worked the California end of the investigation of the suspected fence Travis McAdams, and that he worked in conjunction with the Louisville, Kentucky office, specifically Agent Long, as well as with California local law enforcement agencies, in his investigation into the case of the stolen truck and diesel engine parts.

With regard to the truck incident, Agent Hinderaker stated that the Louisville personnel told him that Colvin had reported seeing a tractor truck with a particular serial number in McAdams' possession. After checking McAdams' premises several times, Agent Hinderaker could not find the truck. He was also unable to locate any report of the stolen vehicle, or any registra-

tion, on the basis of the serial number provided by Colvin. Agent Hinderaker further testified to the inability to locate any report of stolen engine parts matching any of the serial numbers provided by Colvin. He further stated that to his knowledge Agent Long had cooperated fully in the investigation, and that Agent Hinderaker had no reason to believe that any agent involved in the case had engaged in illegal or unethical activity.

## C) JOHN COLLINWOOD'S TESTIMONY.

The third FBI witness was John Collinwood, Chief of the Civil Litigation Unit, FBI Headquarters. At the time of the departmental investigation into the Long/Colvin affair, Mr. Collinwood was a member of the criminal undercover review committee, in which capacity he handled informant matters as well as undercover matters. Mr. Collinwood testified that he reviewed pertinent files to determine whether or not Agent Long was acting within the scope of his employment so as to warrant a recommendation by the FBI that Agent Long be granted Department of Justice representation for his criminal case. The pertinent files which Collinwood reviewed included the files from the FBI's internal investigation, in which the FBI had concluded that Long had violated internal bureau rules but had not participated in criminal activity; and also the file from a subsequent investigation conducted by the Public Integrity Section of the Department of Justice in which the Department had determined that federal prosecution of Agent Long was not warranted.

Mr. Collinwood testified that upon review of relevant documents he concluded that Agent Long was indeed acting within the scope of his employment. Although he declined to render his opinion as to whether or not Agent Long's actions were necessary and proper to the performance of his duties, Mr. Collinwood concluded that Agent Long's "actions were sufficiently reasonably related to his duties and responsibilities to not take him outside the scope of his employment."

The only evidence offered by the Commonwealth was a sworn statement of May 17, 1985 given by Agent Long to his superiors at the FBI. Counsel for the Commonwealth informed the Court that "it is the Commonwealth's position that that statement alone is sufficient to go forward and have a jury trial." Counsel for defendant Long also asked the Court that Agent Long's sworn statement be made a part of the hearing, stating to the Court, "We are saying that it was, and his statement is, is evidence ... that he was acting in the scope and that it was proper." We now quote that sworn statement in its entirety:

"I, SA [Special Agent] LARRY A. LONG, having been duly sworn by SA JAMES S. TATMAN, hereby make the following statement to SA'S MICHAEL T. BARTLEY and JAMES S. TATMAN, who I know to be Special Agents of the Federal Bureau of Investigation (FBI).

"I entered on duty with the FBI on November 4, 1968, and am currently assigned as a Special Agent in the Lexington, Kentucky, Resident Agency of the Louisville Division.

"I understand that this is a criminal inquiry and am being interviewed in connection with allegations that Special Agents of the FBI have been involved in activities which might involve Interstate Transportation of Stolen Property—Conspiracy, Obstruction of Justice, and Misprision of a Felony. I have been advised of my rights and responsibilities in connection with this inquiry as set forth in a "Warning and Assurance Form" (FD–644) which I have read and signed.

"During the preparation of this signed statement, Mr. GUY R. COLSON of the law firm Fowler, Measle and Bell, is present to serve as my legal counsel. I have requested that strict confidentiality be afforded this statement and the information therein in accordance with the provisions of the Freedom of Information Act and any other applicable law.

"With respect to the allegations which have been described to me concerning this matter, I have had the opportunity to review all the pertinent files in order to re-

fresh my recollection about events that occurred approximately six years ago. Also, I have provided the interviewing Agents with personal notes which I have kept and which were compiled contemporaneously during the time period of these allegations. I have maintained these notes because they are notes which I kept when DELANE COLVIN was an informant and which were filed away and forgotten by me. After I testified in the St. Louis case against COLVIN, I found these notes and I decided to keep them in the event they should ever be needed. I have a habit of maintaining notes while cases are pending some of which are never placed in an investigative file.

"Upon entering on duty with the FBI, I first was assigned to the Tampa Division for one year and then to the Newark Division where I worked Theft From Interstate Shipment cases for approximately the first eight years of my career. Upon assignment to the Louisville Division in September, 1977, I immediately was assigned to Squad 5 where I worked reactive type cases.

"I first met DELANE COLVIN in March, 1979, when he was brought to the Louisville office by THOMAS CLAY, an attorney. At that time, COLVIN advised that he had information concerning criminal activity in the Louisville area which he desired to provide on a continuing basis. Contacts were had with COLVIN after that time outside the presence of Mr. CLAY, who was never contacted again regarding COLVIN by me. My review of the informant file determined that he provided information on March 9, 1979, and April 2, 1979, concerning the fencing of stolen tractor trucks and the possible burglary of a warehouse in the Louisville, Kentucky, area. This informant file was opened on April 4, 1979. These contacts and subsequent contacts determined that COLVIN was aware of criminal activity in the Louisville area.

"COLVIN was eager to provide information and assured me that certain activities were going on which he had knowledge of and that he could be of assistance in mak-

ing arrests and recoveries by providing me that information. To the best of my knowledge, this is the first informant that I developed in the Louisville Division who provided worthwhile information.

"I would like to state here at the outset that I never instructed DELANE COLVIN to commit crimes in the name of the FBI. I never told COLVIN that he could steal under the guise of the FBI and sell stolen property and keep the profits.

"My review of Louisville file 26–55274 indicates that COLVIN advised me on either March 9, or April 2, 1979, that a tractor truck was stolen in the Kentucky/Indiana area and was to be taken to TRAVIS MC ADAMS in Indio, California, during the week of April 2–April 6, 1979. My notes contain a message slip which indicates a Mr. COLVIN called me on April 6, 1979, with message, 'VIN Z985VBC5234 1979 Ford Sleeper' and notation of 27 miles. Later, on April 17, 1979, COLVIN advised me that during the week of April 9–13, 1979, he was in California and observed a new Ford tractor truck in the possession of MC ADAMS. COLVIN indicated this truck had been stolen from a Ford dealership in Louisville, Kentucky, and transported to California where it was sold to MC ADAMS. COLVIN stated he had been able to inspect the truck and determined that it bore VIN Z985VBC5234. In my mind I am confident that I knew that COLVIN was in possession of what *he said* was a new stolen truck and that COLVIN and an individual by the name of ED KENDALL were going to drive the truck to MC ADAMS in Indio, California. In the original meeting with COLVIN in March, 1979, he told me KENDALL had dealt in stolen property with MC ADAMS in the past. My subsequent investigation through April, 1979, was not successful in determining that this tractor truck had been stolen as the VIN had not been entered in NCIC. I also recall checking with a Ford dealer in Louisville and determining that no truck had been reported stolen. Also, efforts by the FBI in California to find the truck, which was physically described by COLVIN, also were unsuccessful. Therefore, at this time I could not determine the accu-

racy of COLVIN's information because the truck had not been reported stolen. Later I was told by COLVIN that he and KENDALL had sold the truck to MC ADAMS. COLVIN never told me who actually stole the truck from the Ford dealership. My conversations with COLVIN regarding this matter were that it was "KENDALL's deal." COLVIN's participation in this matter, according to COLVIN, was KENDALL's idea, not COLVIN's nor mine. I never told COLVIN or anyone else to steal a truck in order that it could be transported for sale to MC ADAMS in California. I certainly was not aware before COLVIN told me about his possession, with KENDALL, of a stolen truck that they might have been the individuals responsible for the theft. All the foregoing happened before the truck was reported stolen. I now know that the truck was reported stolen in May but I conducted no investigation after that time and the case was closed.

"Furthermore, I do not remember that I received a call from local authorities in Texas when COLVIN and KENDALL were stopped during their travels in the stolen truck to California.

"With regard to Louisville file 87-17934 which reports the investigation of a theft of engine parts from Cummins Diesel Sales of Louisville, Inc., 9820 Bluegrass Parkway, Jeffersontown, Kentucky, on August 25-26, 1979, I have reviewed the file and my personal notes. Also, I have listened to three cassette tapes which allegedly contain conversations I had with DELANE COLVIN prior to the theft; while listening to the tapes, I read the transcripts of the conversations.

"I recall having conversations with COLVIN pertaining to the matters discussed on these tapes. There were other conversations between myself and COLVIN, both personal and telephonic, concerning this matter going back to April, 1979. I was never aware that COLVIN was taping any conversations I held with him and I never gave COLVIN permission to tape my conversations.

"In response to the allegations involving the theft from Cummins, which have been made against me by COLVIN and subject to my explanation later in this statement, I would like to state the following:

1. I gave COLVIN permission to commit the Cummins burglary.

2. I knew it was being planned and that there was a problem with keys.

3. I had been asked by COLVIN to be a lookout.

4. I knew that the plan was for the stolen parts to be taken to California for sale to subject MC ADAMS.

"I did not tell local Kentucky authorities that COLVIN and DUPIN and others had committed the burglary. I offered them assistance during the conduct of their investigation but it is not true that at any time I instructed COLVIN to place an anonymous telephone call in order to redirect local authorities when they apparently suspected that COLVIN was responsible for the burglary.

"I remember telling the Jefferson County Police Department that COLVIN was an informant and that he was working with me concerning the Cummins matter.

"When COLVIN took some of the parts to California, he met with a Special Agent. The Special Agent obtained all numbers from these parts, called those numbers to me in an attempt to specifically identify the parts. I contacted Cummins with these numbers and they advised me they could not say that these items were some of those taken from their burglary in August, 1979. It is my understanding that the parts were left in the possession of COLVIN and I subsequently learned from him that the parts had been sold to MC ADAMS. COLVIN was allowed to keep the money from the sale, since the parts had not been proven to be stolen.

"At no time in my dealings with COLVIN did I instigate, set up or instruct him to commit this burglary. I did not receive any money from this burglary or any other criminal activity.

"Information concerning a warehouse burglary was made known to me by COLVIN as early as April, 1979. During the

course of conversations with him from April through August of 1979, the plan for the burglary to occur at the Cummins warehouse in Bluegrass Park became more definite. According to COLVIN's information to me, this burglary was being planned by people other than himself. One of the individuals involved was EDDIE DUPIN. The plan called for keys to the warehouse to be made available to these other individuals. At some point, COLVIN was not happy with DUPIN and the other people and desired to take a more dominant role in the matter. His conversations to me were originally that he would act as the middle man. There were numerous conversations with him, both personal and telephonic, during which I told him that he could not enter the warehouse. He did have permission to confer with these people with the ultimate goal in this matter of the parts being taken to MC ADAMS and a case made against MC ADAMS. MC ADAMS as the target was picked by COLVIN and these other individuals and not by me.

"As the actual time of the burglary approached, there were numerous conversations with COLVIN concerning how the burglary would actually take place. He told me that since he had assumed a dominant role that he would be the one to have the keys to the warehouse. He was consistently told that he should not enter the warehouse.

"Conversations which I have heard and read transcripts of indicate that he had the keys and would be one of the individuals who would participate in the burglary.

"I cannot vouch for the validity of these tape recordings although I do recall having conversations with him pertaining to these matters. These tapes do not reflect in any discernible form any of my cautions to him about what his actions should be. I have no way of telling if these were the conversations where I made these cautions or not, nor when these conversations took place in relation to the burglary.

"With regard to the conversations of my being a lookout, there were conversations wherein he asked for me to be a lookout but I never acted as a lookout for him in this matter.

"With respect to a proposed undercover coal mining/heavy equipment operation which was reported in Louisville file 87–18007, my review of the file reflects that I met with COLVIN and RODNEY GLENN in October, 1979, to discuss a coal mining operation. GLENN indicated he wanted to start such a business and was sure he would be contacted and approached to buy stolen heavy equipment. The proposal involved both GLENN and COLVIN establishing such a business under the guidance of the FBI in order that "buy/bust" situations might be developed. This investigative matter was closed when agreement could not be reached with both COLVIN and GLENN concerning their responsibilities and the requirement of the FBI.

"Specifically, a meeting was held in the office of attorney JAMES BARTON ADAMS, JR. during which I discussed FBI regulations concerning undercover operations and restrictions which are placed on informant activities. After the meeting, I drafted a document, which was typed in the Louisville FBI Office, and which listed a number of stipulations which I felt both COLVIN and GLENN must agree to before I would be willing to endorse their proposed operation. At a later date, I met again with COLVIN and attorney ADAMS but I do not remember if GLENN was present at the second meeting. I presented them with my agreement which let them know the responsibilities and requirements that would be placed on them if the arrangement was agreed upon. They were unwilling to agree to all these conditions and, as a result, no further action was taken in this regard. I have made available the original and copy of the agreement that was presented at this meeting.

"At no time were they ever told they would be given blanket immunity to steal heavy equipment to use in this operation and/or to steal and sell for profit.

"Concerning Louisville file 183E–509 entitled, [redacted]. I have no knowledge of this case.

"Concerning Louisville file 182C–847 entitled, "UNSUBS: [redacted]." I have no knowledge of that case.

"In regards to Louisville file 194–93 entitled, [redacted]. CHARLES L. CISSELL, Jefferson County Deputy Sheriff and Special Bailiff, Jefferson County Circuit Court; HOBBS ACT–CPO; 00: Louisville," COLVIN initially contacted me concerning information that CHARLES CISSELL had told him that judges in the Jefferson County court system could be bribed to fix cases. Instant file was opened in this matter and assigned to SA LOUIS J. ANTLE who handled subsequent contacts with COLVIN in this matter. From this point on, I was only peripherally involved in the investigation. I have been made aware that COLVIN alleges that, at the direction of the FBI, bribes were offered to local judges. Other than the context of this investigation, I have no knowledge of such activity.

"I have never given anyone information which would allow them to avoid certain 'fences' in their attempt to sell property.

"Although I was asked by DELANE COLVIN to involve myself in a domestic divorce dispute between THOMAS CLAY and his wife, PATS[ ]Y CLAY, I never approached the Crestwood State Bank concerning a mortgage foreclosure of CLAY property. I am unaware of any Agent of the FBI contacting the bank in this regard.

"I never instructed COLVIN or any of my informants to steal automobiles and then turn them in to me for recoveries.

"In regards to Louisville file 15B–9179 entitled, "JERRY LYNN GOSS, aka; JAMES CLAYTON LITTLE; DANIEL PHILLIP PRIDDY, aka; TFIS; ITSP; 00: Louisville," I have no knowledge of this case.

"I am aware that COLVIN and KENDALL were arrested and convicted for the theft and interstate transportation of a truck. During the trial, I testified that I had not directed them to steal the truck. I know this to be the case and am not aware that any one in the FBI directed or had prior knowledge of the theft.

"With respect to any allegations concerning kidnaping, the only conversation I remember having with COLVIN was a discussion in which COLVIN suggested that he undertake a mission with the FBI's assistance in order to kidnap ROBERT VESCOE from Cuba and bring him back to the United States. I remember telling COLVIN that this was a preposterous idea and there was no further conversation in this regard.

"Concerning the purchase of a car by COLVIN from me in March or April, 1980, I had a 1971 Chevrolet, having in excess of 90,000 miles on it and containing a second hand engine, which was for sale. In driving this car when I met COLVIN, he indicated that he would be interested in buying the car since it was for sale as indicated by a 'For Sale' sign in the window. I was asking $700 for the car and over a period of a couple of weeks and us discussing him purchasing the car, he did purchase the car and paid me $700. The car was delivered to him and the registration signed over to him at a meeting in Crestwood, Kentucky, sometime between March 11, 1980, and April 15, 1980. The $700 that he paid me was to my knowledge his income from his legitimate construction business.

"I would like to explain here my answer to the allegation that I permitted COLVIN to participate in a burglary.

"COLVIN was the first informant in my career who began giving information of criminal activity after just appearing at the office. His information and his conversations with me over a period of time indicated that he had the information concerning the activities of several individuals in the Kentucky/Indiana area. His information to me was always that someone else was the moving force in the criminal activity. As an informant, he told me that his relationships with the people would allow him to get close to and report on these individuals. Since I had been in the division for 18 months and had not developed a quality informant, I suppose I was overwhelmed by what it appeared he could do. He started providing me with information and it was in the context of 'so and so is

going to do this and we will be able to make a case.'

"Specifically, with regard to the Cummins case, COLVIN provided me with information about a warehouse burglary as early as April, 1979. Over the next five months, there must have been twenty (20) different conversations, both personal and telephonic, concerning this warehouse burglary. The early conversations concerned 'some people' committing the burglary. The conversations then got specific in EDDIE DUPIN being involved and that keys would be made available through these other people. Sometime in these conversations, the specific warehouse was mentioned and that COLVIN would be the one with access to the keys. It was pointed out continuously and repeatedly to COLVIN that he could facilitate criminal activity, but he could not initiate criminal activity. Since he had been telling me all along that other people had been planning this burglary, I did not consider this as being COLVIN's plan or his initiation.

"I recall conversations with COLVIN regarding a mix-up in the keys to the Cummins' warehouse, where it could be construed that he had already made an attempt at the burglary. I cannot say that the tapes of conversations that I heard on May 16, 1985, were these conversations. Nevertheless, I recall telling COLVIN that he was not to enter the warehouse. My permission to him to participate in the burglary by being at the warehouse was permission that I should have obtained from a higher authority with concurrence of the United States Attorney.

"I did not have any criminal intent in this matter. By my inaction to properly document my contacts with COLVIN and not contact my superiors, this permission was conferred to COLVIN. This was poor judgment.

"I never instructed COLVIN to commit a burglary and never gave actual, verbal permission to COLVIN in this matter.

"My failure to stop completely this operation allowed COLVIN, as an informant, to participate in this matter with my permission.

"The expectation of making a case against MC ADAMS overshadowed and clouded the proper handling of COLVIN. Furthermore, I felt an obligation to protect the identity of COLVIN, as I would any informant.

"In hindsight, my failure to take the proper action granted the permission that COLVIN alleges in the Cummins case.

"I have read this statement consisting of this and ten (10) other pages and it is true and correct."

"/s/ <u>Larry A. Long</u>
LARRY A. LONG"

Sworn to and subscribed before me

this 17th day of May, 1985, at

Louisville, Kentucky.

[/s/] *James S. Tatman, SA, FBI*

Witness:

[/s/] *Michael T. Bartley S.A. FBI.*

[Handwritten]

In addition to the above statement, to the best of my knowledge no agent was aware that Colvin initiated criminal activity while working for me as an informant. I never heard any agent tell Colvin that he could initiate criminal activity.

LAL
[/s/] Larry A. Long
5/18/85
[/s/] James S. Tatman
5/18/85

## DISTRICT COURT'S ANALYSIS

In a memorandum filed July 3, 1986, the district court set forth its reasons for granting the motion to dismiss the indictment pursuant to Rule 12(b), Fed.R. Crim.P.[4] The Court initially made the pre-

---

4. On June 4, 1986, subsequent to the evidentiary hearing, an organization called the Better Government Association filed a motion for leave to file an *amicus curiae* memorandum in opposition to the defense motion to dismiss.

Since the district court overruled the Better Government Association's motion, that association's tendered memorandum is not a part of the record. While the decision of the district court to disallow the filing of the *amicus curiae*

liminary determination of the standard governing Rule 12(b) motions to dismiss, i.e., that if the underlying facts are substantially in dispute, a Rule 12 pretrial motion is not the proper vehicle for deciding whether the Supremacy Clause precludes an indictment of a federal agent by a state.

The district court's opinion then focused upon the paucity of evidence presented at the hearing conducted May 30, 1986. The court summed up that evidence and highlighted the dilemma it faced as follows:

> Although the Commonwealth has alleged a factual dispute in its briefs, it presented no evidence, save the statement by the defendant to other FBI agents. The defendant did not testify, and two others, Delane "Red" Colvin and Eddie Dubin [sic], who were called as witnesses and who are alleged to have participated in one or both of the burglaries charged in the indictment, exerted their rights under the Fifth Amendment to the Constitution not to testify. Thus, the Court is left with an indictment, a statement from the defendant, and testimony from three other present or former FBI officers who know nothing directly about the case but who were familiar with the facts from what they had been told about the matter from the defendant or other persons. Thus, the statement by the defendant is undisputed, unless one can infer a dispute from the charge in the indictment itself.

Memorandum of July 3, 1986 at p. 1151 (footnotes omitted).[5]

The district court noted that the "prosecution has admitted that it could not prove that Long was directly engaged in the burglary, but only was an accomplice who gave Colvin permission to commit the Burglary."

Turning to the contents of Agent Long's sworn statement, the district court observed the contradiction that Long at one point stated that he gave Colvin permission to commit a burglary, but later stated that at no time did he instruct Colvin to commit a burglary. The court also noted that on the one hand Long did not inform Kentucky authorities that Colvin and Dupin had committed a burglary, although he did inform the local police that Colvin was an informant working with Agent Long on the Cummins burglary. The court also acknowledged that Agent Long did not have authority from a superior to permit Colvin to participate in a burglary. However, the Court noted the testimony of the three FBI witnesses who had testified that Long had not violated the Levi Guidelines or any criminal laws.

Based upon the evidence before it, the Court concluded that Agent Long's conduct was "clearly in the performance of an act he was authorized to do as part of his duty," and further that "it was necessary and proper, in the investigation of Travis McAdams and others who were dealing in stolen vehicle parts." The court concluded:

> Even if Long acted outside the guidelines by failing to report the informant to his superior or failing to obtain permission from his superior before the informant participated in the burglary, those are not grounds to charge Long with Burglary. The test on what is "necessary and proper" is a subjective one and

---

memorandum is not before us on appeal, we are somewhat enlightened about the record by the district court's following comment in its memorandum opinion dismissing the indictment:

> There are other exhibits which have been tendered to the Court by an organization known as the Better Government Association, which has moved the Court for leave to file an *amicus curiae* memorandum in opposition to the motion to dismiss. Attached to that tendered memorandum are certain exhibits, including a video tape that the Court has not reviewed, and a transcript of the trial of the witness Colvin in the United States District Court for the Eastern District of Missouri.

> The Court feels it should not consider this evidence, as it is not authenticated and was not introduced at the hearing.

**5.** Citing *United States v. Maselli,* 534 F.2d 1197 (6th Cir.1976), the trial court recognized that "it is a basic principle of law that an indictment is not evidence." The same holds true, of course, for a bill of particulars. The district court also noted the Commonwealth's assertion that the witnesses Colvin and Dupin would testify should the case go to trial, but the Court noted that "there is nothing before the Court to determine what their testimony will be." Memorandum at p. 3, fn. 3.

goes to whether the defendant reasonably thought his conduct was necessary and justifiable.

Although this Court certainly does not wish to convey the impression that it condons [sic] burglaries, often federal agents will perform acts which on their face appear to be criminal acts under state law. Thus, homicide, ... bribery, ... or the sale or purchase of narcotics, ... may be violations of state law, but if the conduct is necessary and proper and part of the agent's authorized duties, even when he uses poor judgment, he is protected by the Supremacy Clause of the Constitution.

Memorandum at 1152 (citations omitted).

In short, based upon the evidence before it, the district court concluded that there was no genuine factual dispute that Agent Long's conduct was undertaken in the performance of an act which he was authorized to do as part of his duty, and further that his conduct was necessary and proper to the performance of that duty. The Court accordingly sustained the defense motion and dismissed the indictment.

Having reviewed the evidence before the district court, we conclude that the Court properly sustained the pretrial motion to dismiss.

### APPLICABLE LAW

#### I. *The Concept of Federal Supremacy.*

The Supremacy Clause of the Constitution of the United States is found in Article VI, Clause 2. It states as follows:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

In seeking to comprehend the import of the Supremacy Clause, our inquiry of necessity begins with the landmark case of *McCulloch v. Maryland,* 17 U.S. (1 Wheat.) 316, 4 L.Ed. 579 (1819), where the Supreme Court held that the State of Maryland could not constitutionally levy a tax upon the Bank of the United States. Chief Justice John Marshall, writing for the Court, expounded as follows upon the paramount character of the Constitution of the United States:

There is no express provision for the case, but the claim has been sustained on a principle which so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds. This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective states, and cannot be controlled by them. From this, which may be almost termed an axiom, other propositions are deduced as corollaries, on the truth or error of which, and on their application to this case, the cause has been supposed to depend. These are, 1st. That a power to create implies a power to preserve: 2d. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve: 3d. That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme.

17 U.S. at 426. In later announcing the unanimous conclusion of the Court that Maryland's law imposing a tax on the Bank of the United States was unconstitutional, the Chief Justice stated:

The Court has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that su-

premacy which the constitution has declared.

*McCulloch*, 17 U.S. at 436.

A few years later, the Court adhered to the principles announced in *McCulloch* and held that exemption of a federal institution from state control need not be explicitly provided for by Congress. In *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 865, 6 L.Ed. 204 (1824), Chief Justice Marshall, again writing for the Court, stated as follows:

> It is contended, that . . . this exemption [from state taxation] ought to have been expressly asserted in the act of incorporation; and, not being expressed, ought not to be implied by the court. It is not unusual, for a legislative act to involve consequences which are not expressed. An officer, for example, is ordered to arrest an individual. It is not necessary, nor is it usual, to say that he shall not be punished for obeying this order. His security is implied in the order itself. It is no unusual thing, for an act of congress to imply, without expressing, this very exemption from state control. . . . The collectors of the revenue, the carriers of the mail, the mint establishment, and all those institutions which are public in their nature, are examples in point. It has never been doubted, that all who are employed in them, are protected, while in the line of duty; and yet this protection is not expressed in any act of congress. It is incidental to, and is implied in, the several acts by which these institutions are created, and is secured to the individuals employed in them, by the judicial power alone; that is, the judicial power is the instrument employed by the government in administering this security.

From these great principles there arose a body of law more specifically applicable to the issue presently confronting us: The nature and scope of the constitutional protection which cloaks a federal agent in the performance of his duties. Put another way, that issue is whether, and under what circumstances, a federal agent can be held accountable to a state for conduct *prima facie* violative of state law but nonetheless performed in the course of his official duties. We turn now to an examination of that question.

## II. *Immunity Under the Supremacy Clause.*

In *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 25 L.Ed. 648 (1879) the Supreme Court affirmed the power of Congress to provide for removal to federal court, before trial, of a state criminal action prosecuted against a defendant who claimed federal authority to act as he did.[6] In declaring the removal legislation constitutionally valid, the Court reasoned that "the possibility of the general government's preserving its own existence" (*id.* at 262) depended upon such a holding. The Court stated:

> [The federal government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State, yet warranted by the Federal authority they possess, and if ʲthe general government is powerless to interfere at once for their protection,—if their protection must be left to the action of the State court,—the operations of the general government may at any time be arrested at the will of one of its members.

*Id.* at 263.

In other situations involving attempted state prosecution of a federal officer, the federal courts consistently adhered to the rule that federal supremacy is the principle determinative of the jurisdiction of a state court to try a federal agent for a state crime. So, for example, in *Ohio v. Thomas*, 173 U.S. 276, 19 S.Ct. 453, 43 L.Ed. 699 (1899), the State of Ohio indicted the governor of a federally instituted soldiers' home when he served oleomargarine without

---

**6.** The case involved an Internal Revenue collector who was indicted for murder by the State of Tennessee following a shootout during an attempt by the revenue officer to seize illicit distilleries.

posting a notice required by state law. Following his conviction, the defendant applied to the federal court for a writ of habeas corpus. The writ was granted, the Sixth Circuit Court of Appeals affirmed, and the Supreme Court affirmed on appeal, holding that the defendant was not subject to the state law in question, and that the state court had no jurisdiction to subject him to criminal proceedings, "because the act complained of was performed as part of the duty of the governor as a Federal officer in and by virtue of valid Federal authority, and in the performance of that duty he was not subject to the direction or control of the legislature of Ohio." *Id.* at 284, 19 S.Ct. at 456.

So too, in *Johnson v. Maryland,* 254 U.S. 51, 41 S.Ct. 16, 65 L.Ed. 126 (1920), the Court held that a state has no power to require a post office employee to obtain a state driver's license in order to deliver the mail in his government mail truck. "Such a requirement," said the Court through Mr. Justice Holmes, "does not merely touch the Government servants remotely by a general rule of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that the Government has pronounced sufficient." *Id.* at 57, 41 S.Ct. at 17.

It should be noted, however, that the Court in *Johnson v. Maryland* drew a distinction between general local rules of conduct, and local laws specifically affecting the manner in which one's federal duties are carried out. In a passage providing some guidance for us here, the *Johnson v. Maryland* Court explained the difference as follows:

Of course an employee of the United States does not secure a general immunity from state law while acting in the course of his employment.... It very well may be that, when the United States has not spoken, the subjection to local law would extend to general rules that might affect incidentally the mode of carrying out the employment—as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets. This might stand on much the same footing as liability under the common law of a State to a person injured by the driver's negligence. But even the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States.

*Id.* at 56, 41 S.Ct. at 16 (citing *In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55) (other citations omitted).

In citing *In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890), the *Johnson v. Maryland* Court cited what has become generally recognized as the benchmark case in the field. Neagle was a deputy U.S. Marshal assigned to protect Supreme Court Justice Stephen J. Field as the justice duly made his rounds as Ninth Circuit judge. When a would-be assassin named Terry assaulted Justice Field and then appeared to Neagle to make an attempt to draw a knife, Neagle shot and killed the attacker. Neagle was then arrested and charged with murder by the State of California, where the incident occurred. The United States Circuit Court for the District of California discharged the prisoner upon writ of habeas corpus, finding that Neagle was held in custody for an act done in pursuance of a law of the United States, and that he was imprisoned in violation of the Constitution and laws of the United States. On appeal, the Supreme Court of the United States affirmed the judgment of the circuit court discharging the prisoner from the custody of the California County Sheriff. Following an exhaustive analysis of prior case law, the *In re Neagle* Court uttered the words of the following passage which have since become the standard against which cases of this sort are measured:

To the objection made in argument, that the prisoner is discharged by this writ from the power of the state court to try him for the whole offense, the reply is, that if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in

doing that act he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the State of California. When these things are shown, it is established that he is innocent of any crime against the laws of the State, or of any other authority whatever. There is no occasion for any further trial in the state court, or in any court....

*Id.* at 75, 10 S.Ct. at 672 (emphasis in original).

The Court then concluded:

The result at which we have arrived upon this examination is, that in the protection of the person and the life of Mr. Justice Field while in the discharge of his official duties, Neagle was authorized to resist the attack of Terry upon him; that Neagle was correct in the belief that without prompt action on his part the assault of Terry upon the judge would have ended in the death of the latter; that such being his well-founded belief, he was justified in taking the life of Terry, as the only means of preventing the death of the man who was intended to be his victim; that in taking the life of Terry, under the circumstances, he was acting under the authority of the law of the United States, and was justified in so doing; and that he is not liable to answer in the courts of California on account of his part in that transaction.

*Id.*

■ It is by now well settled that under *In re Neagle*, a two-part test determines whether or not a state court has jurisdiction to prosecute a federal agent for conduct facially violative of a state's criminal code. Under *Neagle,* a state court has no jurisdiction if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do.

In the leading case of *In re McShane's Petition,* 235 F.Supp. 262 (N.D.Miss.1964), the facts arose out of the famous controversy surrounding James Meredith's enrollment at the University of Mississippi. It is a case often cited for its well reasoned opinion and exhaustive analysis of *In re Neagle* principles. The case arose in the following manner.

When violent opposition met the Fifth Circuit's orders that Mississippi University officials admit James Meredith as a student, the Attorney General of the United States assigned the U.S. Marshals to ensure enforcement of the court's orders. McShane was the marshal in charge of the entire operation. As the marshals surrounded the University's administration building, a crowd gathered, and as the day went on the crowd grew angrier and larger and hurled objects at the marshals. At last McShane ordered the marshals to fire tear gas into the crowd, after which a terrible riot ensued and two people were killed. "Expert" opinions later differed as to whether the use of tear gas was a wise or a foolish crowd control method under the circumstances.

McShane was indicted in Mississippi State Court for breach of the peace and inciting a riot. The federal district court, Clayton, J., presiding, released McShane under a writ of habeas corpus on *In re Neagle* principles. The court first held there was no dispute that McShane was acting in the performance of his duties imposed by federal law. McShane was acting under express statutory authority to execute federal court orders and also under the express specific orders of the Attorney General to remove all obstructions of justice to ensure that the subject court orders would be executed and enforced.

Following a comprehensive review of the reported case law, the *McShane* court then held that the petitioner, within the meaning of *Neagle*'s teaching, had done no more than what was necessary and proper for him to do in the performance of his duties.

The court noted that it was undisputed that McShane had no motive other than to do his job under circumstances as they appeared to him, and that he had an honest and reasonable belief that what he did was necessary. The court stated there was no question it was reasonable to believe that drastic action was necessary, based upon

the attitude and actions of the crowd. Thus, the court reasoned it was also reasonable to believe that the use of tear gas, a discretionary choice of means on McShane's part, was a proper measure, and the dispute as to the wisdom of McShane's decision to use tear gas was immaterial to the whole question.

The substance of the standards applied in the foregoing cases is that of honest and reasonable belief. If, as here, the petitioner shows without dispute that he had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an honest and reasonable belief that what he did was necessary in the performance of his duty to see to the execution of the two court orders, then he is entitled to the relief he seeks. This is so even though his belief was mistaken or his judgment poor.

*McShane*, 235 F.Supp. at 274.

Thus the case law teaches that a mistake in judgment or a "botched operation," so to speak, will not of itself subject a federal agent to state court prosecution. In the more recent example of *Clifton v. Cox*, 549 F.2d 722 (9th Cir.1977), Clifton was an undercover federal narcotics agent. He and his partner obtained an arrest warrant for a drug suspect who was reported to be armed and possibly dangerous. The agents landed in the suspect's yard via an army helicopter. Clifton's partner tripped and fell just as Clifton heard a noise that sounded like gunfire. Clifton, thinking his partner had been shot by the suspect, rushed the suspect's house, kicked the door down, and saw the suspect fleeing for the woods. After the suspect ignored two warnings to halt, Clifton shot and killed him.

Clifton was indicted for second degree murder and involuntary manslaughter by the State of California. The district court granted Clifton's petition for a writ of habeas corpus. The court of appeals affirmed, holding that Clifton had acted within the scope of his authority and had not employed means which he could not honestly consider reasonable in the discharge of his duties.

The *Clifton* court stated that even though an agent exceeds his express authority, he does not necessarily act outside of the authority conferred by the laws of the United States. The court distinguished an error of judgment from an act done wantonly and with criminal intent. The court analogized the *Clifton* situation to an old case, *In re Lewis*, 83 F. 159 (D. Washington 1897), where the court granted a writ for United States Marshals who wrongfully seized some private papers while executing a search warrant. Judge Hanford in *In re Lewis*, stated:

In my opinion, the warrant itself was improvidently and erroneously issued, and the proceedings were all ill-advised, and conducted with bad judgment. But where an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet where there is no criminal intent on his part he does not become liable to answer to the criminal process of a different government.

*In re Lewis, id.* at 160 (quoted in *Clifton v. Cox*, at 549 F.2d at 727 fn. 10).

Upon considering the "necessary and proper" question, the *Clifton* court said that the ultimate issue is whether Clifton employed means which he could consider reasonable in the discharge of his duty. The concept contains both a subjective and an objective element. On the subjective side, the agent must have an honest belief that his action was justified. On the objective side, his belief must be reasonable. We note that the court stated that an agent is not required to show that his action was in fact necessary, or in retrospect justifiable. He must only show that he reasonably thought it to be necessary and justifiable. *See also Connecticut v. Marra*, 528

F.Supp. 381, 387 (D.Conn.1981) (applying *In re Neagle* immunity to private citizen working as FBI informant).

But while it is necessary for federal officials to be able to enforce federal laws without undue interference from the states, on the other hand the Supremacy Clause was not intended to be a shield for "anything goes" conduct by federal law enforcement officers.

For example, in a case decided not long after *In re Neagle,* the Supreme Court upheld the lower court's refusal to issue a writ of habeas corpus releasing from state custody United States army personnel indicted for murder and manslaughter by the State of Pennsylvania. In *United States ex rel. Drury v. Lewis,* 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), the soldiers had shot and killed a man who was suspected of stealing from the federal arsenal located in Pennsylvania. The testimony conflicted as to whether the suspect was attempting to escape or whether he had in fact surrendered. The government conceded that if the suspect had surrendered before he was shot, a writ of habeas corpus should not issue to protect the soldiers from prosecution for murder. In affirming the lower court's denial of the writ, the Supreme Court stated as follows:

> The Circuit Court was not called on to determine the guilt or innocence of the accused. That was for the state court if it had jurisdiction, and this the state court had, even though it was petitioners' duty to pursue and arrest [the suspect], if the question of [the suspect] being a fleeing felon was open to dispute on the evidence; that is, if that were the gist of the case, it was for the state court to pass upon it, and its doing so could not be collaterally attacked. The assertion that [the suspect] was resisting arrest

and in flight when shot was matter of defense....

*Drury, id.* at 8, 26 S.Ct. at 232.

Following the reasoning of the *Drury* case, in *Morgan v. California,* 743 F.2d 728 (9th Cir.1984), the Ninth Circuit recently reversed the district court's grant of a writ releasing two federal officers from the custody of the state court, where they were charged with several misdemeanors.

In the *Morgan* scenario, Drug Enforcement Administration agents became involved in an altercation with civilians following a minor fender-bender traffic accident. Not only was there evidence that the agents had been drinking, there was disputed evidence as to whether the agents were en route to meet an informant or en route to a bar to have drinks; as to whether the agents used force on the civilians before or after one civilian displayed a gun; and even as to whether the civilian displayed a gun at all.

In light of that conflicting evidence, the *Morgan* court held it to be an abuse of discretion to release the federal agents from state custody. Citing *Drury, supra,* the court held that "when the facts upon which state court jurisdiction depend are open to dispute, the federal court should permit the state court to determine those facts." *Morgan,* 743 F.2d at 732.[7]

In a leading Second Circuit case arising in a somewhat different context, the court in dicta similarly rejected the notion that a federal agent should have carte blanche simply because he is acting in an official capacity.

In *United States v. Archer,* 486 F.2d 670 (2d Cir.1973), at issue was whether the federal government's participation in a crime should vitiate the convictions of private individuals who took part in committing the crime. The court never decided the question, as it reversed the convictions

---

**7.** We note that in the habeas corpus cases, a defeat of the threshold immunity assertion results in a denial of the writ and remand to state court. *See United States ex rel. Drury v. Lewis,* 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906); *Morgan v. California,* 743 F.2d 728 (9th Cir. 1984). In the removal cases, by contrast, the criminal prosecution remains and is tried in the federal court, which applies federal procedural law but state substantive law. *See Arizona v. Manypenny,* 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981), *reh'g. denied,* 452 U.S. 955, 100 S.Ct. 3100, 69 L.Ed.2d 965 (1981); *Tennessee v. Davis,* 100 U.S. (10 Otto) 257, 25 L.Ed. 648 (1880).

on other grounds. However, through the pen of Judge Friendly the court in *dicta* announced its utter distaste for the conduct of the government agents in carrying out a very complicated "sting" operation designed to expose corruption in New York City's criminal justice system. The court found it distasteful that the government agents had lied to the police department, to a Queens County judge, and to the grand jury. To support its view that the government's conduct was wrong, the court relied upon the concepts that the government should not set a bad example; that the government should not subject innocent citizens to become victims of crime instigated by the government; and that the federal government should not lightly interfere with a state's judicial/police process, even though corruption may be present.

In expounding on these three concepts, the *Archer* court first quoted from the following passage in which Justice Brandeis one time expressed his dissenting view that governmental participation in a crime should vitiate the conviction of private individuals who took part in the crime:

> "Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of law, existence of the government will be imperilled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

*Archer*, 486 F.2d at 674 (*quoting Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (Brandeis, J., dissenting)).

The *Archer* court then noted that although the view of Justice Brandeis has yet to be espoused by a majority of the Supreme Court,

> there is certainly a limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental "investigation" involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.

*Archer, id.* at 676.

Finally, the court expressed its concern that in the *Archer* "sting" operation, "the Government agents displayed an arrogant disregard for the sanctity of the state judicial and police processes...." *Id.* at 677.

*Archer*, of course, was an entrapment case and not a Supremacy Clause case. Its expressed principles are applicable here, however, where we are faced with alleged governmental involvement in criminal activity. Before proceeding further, we note that we think it unwise and impractical to announce a wholesale condemnation of governmental participation in "criminal" activity. Indeed, the *Archer* court opined that the "sting" operation there was "substantially more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests." *Archer*, 486 F.2d at 677.

In the context of a due process challenge, this circuit has addressed the issue of the propriety of governmental involvement in criminal activity. In *United States v. Brown*, 635 F.2d 1207 (6th Cir.1980), we upheld a conviction for receiving stolen goods resulting from the government's infiltration of an interstate burglary ring,

including the use of a paid informant. In *Brown*, an FBI agent had infiltrated the burglary ring and accompanied the suspects on many home burglaries. He reported to the FBI daily, revealed the locations of the burglaries, and provided inventories of the stolen items. The undercover investigation eventually led to the arrest and conviction of Norbert Brown, one of the "fences" for the stolen goods. In appealing his conviction, Brown argued among other things that the government's participation in the burglaries was so outrageous and "shocking to the universal sense of justice" that principles of due process barred his conviction. *See Hampton v. United States*, 425 U.S. 484, 495, 96 S.Ct. 1646, 1652, 48 L.Ed.2d 113 (1976) (Powell, J., concurring in judgment); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In affirming Brown's conviction, we acknowledged the "basic proposition that the use of paid informants to infiltrate criminal enterprises is a 'recognized and permissible means of investigation.'" *Brown*, 635 F.2d at 1212 (citations omitted). Following our investigation of the considerations relevant to determining the scope of permissible government conduct, we observed the dilemma faced by law enforcement officials in attempting to obtain convictions in criminal enterprises. We stated:

> Law enforcement officials are often presented with a formidable problem when they become aware of the criminal activity of individuals who are involved in a large criminal enterprise. The alternatives presented to those officials are exceedingly poor. They may arrest known criminals, thus ceasing their particular harmful effect on society; or they may allow them to continue in their violation of the law with the hope that further investigation will reveal a greater number of those involved in the criminal enterprise, the exposure and arrest of whom may effectively eliminate a much broader range and degree of criminal activity.

> \*    \*    \*    \*    \*    \*

This type of decision is affected by a multitude of varied and subtle considera-

tions, with which law enforcement personnel are only too familiar. Nothing in the record before us indicates that the FBI erred so dramatically in their decision in the instant case that the fundamental canons of due process were violated.

*Brown, id.* at 1214.

In *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir.1982), an *In re Neagle* case, the court recognized that the use of undercover agents is "not *per se* unlawful ... [and] is a recognized technique commonly utilized in narcotic cases." (*citing Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966)). The court affirmed a declaratory judgment that Robert Baucom, an FBI agent indicted by the state of Georgia for attempted bribery, had acted within his authority as an FBI agent when he participated in a bribery scheme as part of a joint federal/state investigation into suspected public corruption. While cautioning about the dangers inherent in the sanctioning of illegal state activity as a means of federal law enforcement, the court nonetheless recognized that as a practical matter it is necessary in certain types of cases.

> The analogy between narcotics and official corruption cases is not a strained one, both are often very difficult to make. A streetwise wary narcotics peddler, and particularly his supplier, can be vexing targets for narcotic prosecutions. Then there may be the wary public official, educated, possibly an attorney, who may only very carefully risk his reputation and his office out of avarice. Like the narcotics supplier, he may also deal only through a trusted intermediary. A dishonest public official who profanes his official trust may do more harm to our society than common criminals, and be much more difficult to investigate and convict.

*Baucom*, 677 F.2d at 1350.

The court held that under *In re Neagle* Baucom was immune from state prosecution under the Supremacy Clause.

The court held that the necessary authority of an agent can be derived from the general scope of his duties, *i.e.*, to assist in federal law enforcement by detecting and prosecuting federal crimes. Since Baucom's authority was adequate to pursue the subject investigation, even if he made an error in judgment, that alone would not subject him to criminal liability for a state offense. The court stated there was no suggestion that Baucom had acted in bad faith or otherwise than merely "to do his duty as he saw it." 677 F.2d at 1350.

For the reasons discussed above concerning the court's view that undercover operations are sometimes necessary in political corruption cases, the court then held that Agent Baucom's conduct was necessary and proper to carry out his duties.

So, then, our study reveals that the focus of the Supremacy Clause problem is the delicate balance between federal and state law enforcement powers. Under principles announced long ago in *McCulloch v. Maryland,* the national government cannot be made to tolerate undue interference from the states in the enforcement of federal law. But neither should any state be made to tolerate unwarranted interference with its duty to protect the health and welfare of its citizens. To the end of achieving that balance, our courts have held that the Supremacy Clause will shield a federal agent from state prosecution, *provided* his acts are both authorized by the laws of the United States and necessary and proper to the performance of his duties.

### III. *Procedure for Deciding Federal Immunity Questions.*

We now address the question perhaps more troubling in this case: by what method should it be decided whether a state does or does not have jurisdiction to prosecute a federal agent? Framed differently, perhaps the question is one of who should bear the burden.

Our study of the history of congressional provisions for removal and habeas corpus in these cases, coupled with our review of the purpose of immediate appeal rights in analogous civil situations involving the qualified immunity defense, leads us to conclude that the district court in the present case properly granted the government's pretrial motion to dismiss.

We turn first to the Commonwealth's assertion that material underlying facts were in dispute and that the district court therefore improperly sustained the Rule 12(b) motion to dismiss. In light of the peculiar evidentiary posture of the case, and the purpose of 28 U.S.C. § 1442(a)(1), we hold that the district court properly dismissed this case on the pretrial motion. Rule 12, Fed.R.Crim.P., states:

(b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion.

\*   \*   \*   \*   \*   \*

(e) Ruling on Motion. A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

\*   \*   \*   \*   \*   \*

(g) Records. A verbatim record shall be made of all proceedings at the hearing, including such findings of fact and conclusions of law as are made orally.

In *United States v. Jones,* 542 F.2d 661, 664 (6th Cir.1976), we addressed the question of what types of issues are properly decided upon a 12(b) motion.[8] We stated in that case as follows:

The rule was written to encourage the making of motions prior to trial. District courts are directed to dispose of all motions before trial if they are capable of determination without trial of the general issue. Generally, motions are capable

---

**8.** In *Jones,* the threshold question was whether the federal wire tape statute, 18 U.S.C. § 2511(1)(a), applied to interspousal wire tapping.

of determination before trial if they raise questions of law rather than fact. However, Rules 12(e) and (g) clearly envision that a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact. Thus, a defense is " 'capable of determination' if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."

*Jones, id.* at 664 (quoting *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 1561, 23 L.Ed.2d 94 (1969) (footnotes and other citations omitted)).

We also observe that the Advisory Committee has stated:

> In the ... group of objections and defenses, which the defendant at his option may raise by motion before trial, are included all defenses and objections which are capable of determination without a trial of the general issue. They include such matters as former jeopardy, former conviction, former acquittal, statute of limitations, *immunity*, lack of jurisdiction, failure of indictment or information to state an offense, etc.

Notes of the Advisory Committee to Fed.R. Crim.P. 12 (emphasis added).

█ We therefore hold, as a general proposition, that a Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution. This of course does not resolve the question of whether the district court properly granted such a motion in the present case. We turn now to that question.

In essence, the district court based its ruling on the fact that the Commonwealth failed to come forward with an evidentiary showing sufficient to rebut the defendant's assertion and showing that the Supremacy Clause and *In re Neagle* principles precluded the state court from prosecuting Agent

Long.[9] We believe the imposition of such a burden on the Commonwealth is consistent with the purpose of the relevant removal provision found in 28 U.S.C. § 1442(a)(1), and also with the purpose of Fed.R.Crim.P. 12(b). We therefore agree with the district court's reasoning and decision dismissing the case against Agent Long.

The purpose of 28 U.S.C. § 1442(a)(1), the federal officer removal statute,[10] was to provide a federal forum in any case where a federal official might raise a defense arising from his official duties, and to permit any state law question to be tried upon the merits in an environment free of local interests or prejudice. *Arizona v. Manypenny*, 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981), *reh'g. denied*, 452 U.S. 955, 101 S.Ct. 3100, 69 L.Ed.2d 965 (1981); *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969); *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 25 L.Ed. 648 (1880). *See also California v. Mesa*, 813 F.2d 960 (9th Cir.1987); *City of Aurora ex rel. Colorado v. Erwin*, 706 F.2d 295 (10th Cir.1983). As is evident from its history, the statute grows out of those same principles set forth in the Supremacy Clause of the Constitution of the United States.

Over one hundred years ago, the Supreme Court in *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 25 L.Ed. 648 (1880), upheld the federal officer criminal removal statute against a constitutional challenge. Stating that "a more important question can hardly be imagined," (*id.* at 262), the Court emphasized the need for the federal government to be able "to interfere at once" to protect federal officers charged with state crimes. *Id.* at 263.

In *Willingham v. Morgan*, 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969), the Supreme Court more recently held that the "color of office" language of the removal statute should be liberally construed, and that the test for removal is broader than the test for official immunity. The *Willingham* Court stated:

---

**9.** *See* district court's summary of the evidence before it, quoted *supra* p. 740.

**10.** *Quoted supra* p. 729.

[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court. The officer need not win his case before he can have it removed. *Id.* at 407, 89 S.Ct. at 1816.

In reaching its holding, the *Willingham* Court recounted the history of the subject removal statute as follows:

The federal officer removal statute has had a long history. *See H.M. Hart & H. Wechsler,* The Federal Courts and the Federal System 1147–1150 (1953). The first such removal provision was included in an 1815 customs statute. Act of February 4, 1815, § 8, 3 Stat. 198. It was part of an attempt to enforce an embargo on trade with England over the opposition of the New England States, where the War of 1812 was quite unpopular. It allowed federal officials involved in the enforcement of the customs statute to remove to the federal courts any suit or prosecution commenced because of any act done "under colour" of the statute. Obviously, the removal provision was an attempt to protect federal officers from interference by hostile state courts. This provision was not, however, permanent; it was by its terms to expire at the end of the war. But other periods of national stress spawned similar enactments. South Carolina's threats of nullification in 1833 led to the passage of the so-called Force Bill, which allowed removal of all suits or prosecutions for acts done under the customs laws. Act of March 2, 1833, § 3, 4 Stat. 633. A new group of removal statutes came with the Civil War, and they were eventually codified into a permanent statute which applied mainly to cases growing out of enforcement of the revenue laws. Rev. Stat. § 643 (1874); Judicial Code of 1911, § 33, 36 Stat. 1097. Finally, Congress extended the statute to cover all federal officers when it passed the current provision as part of the Judicial Code of 1948. See H.R.Rep. No. 308, 80th Cong., 1st Sess., A134 (1947).

*Willingham, id.* at 405, 89 S.Ct. at 1815.

In 1833, at the same time the Congress passed the first of the removal statutes, 4 Stat. 633–34 (1833), Congress also provided the alternative avenue of habeas corpus relief to persons in state custody who were acting under the authority of the United States. That habeas corpus provision, as noted by the Court in *In re McShane's Petition,* 235 F.Supp. at 271, "is one of the oldest of the statutes of the United States, having first been adopted as the Act of March 2, 1833, c. 57, § 7 (4 Stat. 634)." Today's version of the statute, 28 U.S.C. § 2241(c), states in relevant part as follows:

The writ of habeas corpus shall not extend to a prisoner unless—

\* \* \* \* \* \*

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States....

The Court in the *In re Neagle* case reviewed the history of those habeas corpus provisions. That history seems to us to show that their purpose was much the same as the purpose underlying the removal provisions. For example, in summarizing the case reported as *Ex parte Jenkins,* 2 Wall.Jr. 521, 13 Fed.Cas., No. 7,259 p. 445 (E.D.Pa.1853), the *Neagle* Court noted that a writ of habeas corpus had issued to release from state custody a United States Marshal who had been arrested while engaged in pursuing his duties under the fugitive slave law. By contrast, the Marshal in *In re McShane's Petition* was arrested by the state of Mississippi for his conduct in enforcing civil rights laws. Perhaps the irony of the historical contrast shows, more pointedly than anything, that the purpose of the habeas corpus and removal provisions was to ensure federal protection for federal officers performing federal duties, in the anticipation that depending on the sentiments of the time, the federal law being enforced would be unpopular and even hated in various local areas of the country.

Speed serves the congressional purpose of preventing interference with the enforcement of federal laws. As the Supreme Court noted in *Ohio v. Thomas,* 173

U.S. 276, 284, 19 S.Ct. 453, 456, 43 L.Ed. 699 (1899), Congress provided for the writ of habeas corpus in these cases,

> instead of awaiting the slow process of a writ of error from this court to the highest court of the State where a decision could be had. One of the grounds for making such a case as this an exception to the general rule ... consists in the fact that the Federal officer proceeded against in the courts of the State may, upon conviction, be imprisoned as a means of enforcing the sentence of a fine, and thus the operations of the Federal government might in the meantime be obstructed.

We believe the situation confronting us is also analogous to the qualified immunity situation, in that there comes a point early in the proceedings where the federal immunity defense should be decided in order to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the issue decided. *See Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982); *Kennedy v. City of Cleveland,* 797 F.2d 297 (6th Cir.1986). *See also Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), cited with approval in *Mitchell v. Forsyth, supra,* where the Supreme Court stated:

> *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment.

*Mitchell,* 472 U.S. at 526–27, 105 S.Ct. at 2816 (emphasis in original).

■ The principles underlying the *In re Neagle* line of cases, we believe, are similar. Their goal is not only to avoid the possibility of *conviction* of a federal agent, but also to avoid the necessity of undergoing the entire process of the state criminal procedure. Accordingly, we hold that when the Supremacy Clause is raised as a defense by a federal officer charged with a state crime, the court has a duty to make a prompt ruling on that issue. We further hold that if the state fails to come forward with any evidentiary showing that disputed issues of fact exist to rebut the claim of the federal officer, the district court should sustain the defense of immunity under the Supremacy Clause.

Our holding today is a narrow one. It should not be construed as a tacit approval of federal participation in crime or as precedent for condoning questionable conduct under the guise of federal law enforcement. We merely hold that, when a threshold defense of federal immunity is raised to meet a state criminal prosecution, the state cannot overcome that defense merely by way of allegations. Rather, the state at that point must come forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was acting pursuant to the laws of the United States and was doing no more than what was necessary and proper for him to do in the performance of his duties.

For the foregoing reasons, the judgment of the district court, sustaining the motion to dismiss the case, is affirmed.