**F I L E D**

PUBLISH

**April 6, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STATE OF WYOMING,

        Plaintiff-Appellant,

    v.

WESLEY O. LIVINGSTON,

        Defendant-Appellee.

---

STATE OF WYOMING,

        Plaintiff-Appellant,

    v.

MICHAEL DAVID JIMENEZ,

        Defendant-Appellee.

Nos. 04-8085 & 04-8087

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 04-CR-98J and 04-CR-103J)**

Bryan A. Skoric, Park County and Prosecuting Attorney, Cody, Wyoming for Plaintiff-Appellant State of Wyoming.

Michael S. Messenger, Messenger & Jurovich, P.C., Thermopolis, Wyoming for Defendant-Appellee Livingston.

Michael C. Johnson, Assistant United States Attorney (John W. Suthers, United States Attorney for the District of Colorado, with him on the brief), Denver, Colorado for Defendant-Appellee Jimenez.

Before **O'BRIEN**, **McCONNELL**, and **ANDERSON**, Circuit Judges.

McCONNELL, Circuit Judge.

This case involves a seldom-litigated corner of the constitutional law of federalism known as Supremacy Clause immunity. Supremacy Clause immunity governs the extent to which states may impose civil or criminal liability on federal officials for alleged violations of state law committed in the course of their federal duties. These disputes permit of no easy answers, because while state criminal law provides an important check against abuse of power by federal officials, the supremacy of federal law precludes the use of state prosecutorial power to frustrate the legitimate and reasonable exercise of federal authority. The doctrine has played a part in some of the most dramatic clashes between states and the federal government in U.S. history, such as Mississippi's prosecution of a federal marshal for breach of the peace for using tear gas to control riots erupting over the admission of the first African American student to its state university;[1] California's prosecution of a federal marshal for killing a former justice of the state supreme court who he thought was about to assassinate Supreme Court

---

[1] *In re McShane's Petition*, 235 F. Supp. 262 (N.D. Miss. 1964).

Justice Stephen Field;[2] and, more recently, Idaho's prosecution of a federal agent for killing an unarmed woman (and a pet dog) in connection with the notorious raid on a cabin at Ruby Ridge.[3] This case involves the highly charged issue of federal reintroduction of wolves in Wyoming. The question is whether the State may prosecute the federal agent in charge of the wolf reintroduction program and a federal contractor assisting him for alleged violations of the Wyoming laws against trespass and littering, when the defendants unknowingly entered private property in the course of tranquilizing and installing collar monitoring devices on wolves that had strayed from their proper territory.

## I. Background

In 1995, decades after the native population of gray wolves disappeared from Wyoming, the United States Fish and Wildlife Service ("USFWS") embarked on a program of reintroduction of the animal to the State. Not surprisingly for a State heavily dependent on livestock for its economic well-being, the decision to reintroduce wolves met with vehement local opposition, which is well documented in the record. The USFWS recognized that the success of the reintroduction program would depend, in large measure, on its ability to control livestock predation by the reintroduced wolves. The USFWS uses radio

---

[2] *In re Neagle*, 135 U.S. 1 (1890).

[3] *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001) (en banc), *vacated as moot* 266 F.3d 979 (9th Cir. 2001) (en banc).

telemetry to monitor and manage the wolves. USFWS staff capture the wolves and outfit them with radio collars, which reveal the location of wolf packs to the USFWS and enable the agency to use radio-signaled light and siren scare devices to harass the wolves away from livestock and back to their designated territory. The USFWS also provides the radio frequencies to local ranchers to alert them when wolf packs are near.

Radio collaring wolves is not an easy process. Typically, a fixed wing aircraft spots a wolf pack and ascertains whether any members of the pack lack collars. If so, the pilot directs a helicopter team to the pack. When the pack hears the helicopter, the wolves have a tendency to disperse in all directions. The helicopter pursues the wolves at low altitude to enable the gun operator to fire a tranquilizer dart at a wolf from a distance of less than twenty yards. Once struck by a dart, a wolf can still travel up to a mile before the tranquilizer takes effect. This, along with the initial dispersion, means that collaring operations can be spread over several square miles. When practicable, the helicopter will land to pick up each immobilized wolf and take it to a central place where it can be processed with other wolves; however, if landing is not possible, a team member will hike to the wolf and either carry it to the central location or process it on the spot. The tranquilized wolves require close attention. The tranquilizers prevent the wolves from effectively regulating their body temperature, so capture teams

have to move the wolves into open or shady areas as conditions dictate. The wolves also have trouble closing their eyes and regulating incoming light while under effect of the drugs.

Defendant Michael David Jimenez, Appellee in No. 04-8085, has been the project leader of the USFWS Wyoming Wolf Recovery Project since 1999. His prior experience includes participation in a capture team that radio collared 47 wolves in Yellowstone Park and supervision of a team that radio collared another 28 wolves. Defendant Wesley O. Livingston, Appellee in No. 04-8087, an experienced wolf handler, was an employee of Hawkins and Powers Aviation, Inc. working with Mr. Jimenez as a federal contractor to support the wolf monitoring program.

On February 13, 2004, a fixed wing aircraft spotted the Washakie pack, a troublesome group of gray wolves, near Meeteetse, Wyoming, far outside their normal range. This Court is familiar with the Washakie pack on account of earlier litigation in which Wyoming ranching interests sought to compel the USFWS to undertake greater efforts to control the pack. *See Gordon v. Norton*, 322 F.3d 1213, 1215 (10th Cir. 2003). The core of the Washakie pack's territory is north of Dubois, Wyoming in the Dunoir Valley. It is difficult for the USFWS to control the pack through helicopter operations in the Dunoir Valley because of rugged terrain, extensive forest cover, and frequent windy conditions. The

spotting of the pack outside of its normal range presented an opportunity to collar the wolves.  Mr. Jimenez sought and received authorization from his supervisor, Edward Bangs, to begin a capture operation.  On February 14, 2004, Mr. Jimenez, Mr. Livingston, and a helicopter pilot began the operation.

In accordance with USFWS procedure, it was Mr. Jimenez's practice to secure permission from land owners if he thought he would need to go on private land.  Of the members of the capture team, Mr. Jimenez was least familiar with the Meeteetse area.  Before the helicopter flight, Mr. Jimenez spoke with the fixed-wing pilot and the helicopter pilot; they both indicated their belief that the wolves were located on federal land managed by the Bureau of Land Management (BLM).  The area in which the wolves were spotted is a jumble of federal, state, and private land; it is difficult from the air (and often from the ground) to determine the ownership of the land, even with the assistance of maps.  Determining the ownership of the land during the operation was all the more difficult because the doors of the helicopter were removed to allow operation of the dart and net guns; this made map reading impossible during flight because of the wind blowing through the helicopter.  The helicopter was equipped with a global positioning system (GPS) that allowed the pilot to lock in coordinates whenever a dart or net was fired.  Later examination of GPS coordinates indicated

that, at the time when darts or nets were discharged from the helicopter, the target wolves were on private land.

The operation successfully captured and collared five wolves. One wolf was net gunned, physically restrained, radio collared, and released. Three wolves were net gunned and then immobilized with darts and another wolf was darted on a rocky slope where it was unsafe to land. The helicopter harassed this last wolf down a hill toward a gravel road where it was safe for the helicopter to land. After dropping Mr. Jimenez off on the road, the helicopter went to retrieve the three other darted wolves. Mr. Jimenez walked up a hill to retrieve the immobilized wolf. He carried this wolf down the slope to a shaded patch of snow near the road. Later examination by state surveyors revealed that this spot was outside the county road right of way, on private land owned by the Larsen Ranch. The helicopter returned with the three other wolves, which Mr. Jimenez and Mr. Livingston moved to the patch of snow where the other darted wolf had been deposited. At this point the helicopter left to refuel while Mr. Jimenez and Mr. Livingston examined the wolves for injuries, took blood samples, and placed radio collars on them. The wolves were released. A monitoring flight on February 19, 2004 revealed that the Washakie pack had traveled about 15 miles southwest of the processing spot; by March 4, 2004 the pack had returned to its traditional range in the Dunoir Valley.

In his declaration, Mr. Jimenez states that there were no fences, cattle, notices of private property, or other postings at the site where he and Mr. Livingston processed the wolves. He states that he was not familiar with the road and no one had informed him that the area adjacent to the road was private property. As Mr. Jimenez and Mr. Livingston were attending to the wolves, Randy Kruger, a shareholder and employee of the Larsen Ranch Company, owner of the property, drove up the road. He stopped his vehicle and asked Mr. Jimenez what he was doing. Mr. Jimenez explained his purpose. Mr. Kruger never informed Mr. Jimenez that he was on private land and never asked Mr. Jimenez to leave Larsen Ranch property or to remove the wolves from ranch property. Mr. Kruger had a camera and took several photographs of Mr. Jimenez and the wolves, which appear in the record. After an apparently amicable conversation, Mr. Jimenez and Mr. Kruger shook hands before Mr. Kruger departed.

On March 2, 2004 Special Agent Steve Herrmann of the Wyoming Division of Criminal Investigation began investigating allegations by Mr. Kruger that Mr. Jimenez and Mr. Livingston had trespassed on Larsen Ranch land during the capture operation. As part of this investigation Mr. Herrmann met with a Park County Engineer and a Park County Works Department Project Manager to survey the site of the encounter to determine whether Mr. Jimenez and Mr. Livingston had been on private land during the operation. The road, Park County Road 4 CP,

has a sixty foot right of way. The survey indicated that in two of the photographs taken by Mr. Kruger, Mr. Jimenez was on Larsen Ranch land. Interviews with Mr. Jimenez and Mr. Livingston confirmed the general outlines of Mr. Kruger's allegations and also revealed that Mr. Jimenez had walked approximately one quarter mile north of the road to retrieve a darted wolf.

On April 16, 2004, the State of Wyoming filed separate Misdemeanor Informations in the Park County Circuit Court alleging that Mr. Jimenez and Mr. Livingston violated Wyoming Statute § 6-3-303(a), which prohibits knowingly entering the land of another without authorization, and Wyoming Statute § 6-3-204(a), which prohibits littering by placing or depositing objects on the property of another. Mr. Livingston appeared before the Circuit Court on May 11, 2004. Mr. Jimenez never appeared before the Circuit Court. Mr. Jimenez filed a notice of removal in the United States District Court for the District of Wyoming on May 4, 2004. The district court entered an order of removal pursuant to 28 U.S.C. § 1442(a)(1) on May 7, 2004. On May 10, 2004, Mr. Livingston filed a notice of removal with the district court and the court entered an order of removal pursuant to 28 U.S.C. § 1442(a)(1) on the same date.

The State of Wyoming filed motions to vacate the orders removing the prosecutions. In both motions, the State argued that the federal court did not have jurisdiction because the Defendants had not been arraigned and that removal

was improper because the district court did not hold an evidentiary hearing, as required by 28 U.S.C. § 1446(c)(5). On May 27, 2004, Mr. Jimenez filed a motion to dismiss, asserting that because federal law authorized his actions he was entitled to immunity under the Supremacy Clause of the Constitution. On June 8, 2004, Mr. Livingston filed a motion to dismiss, arguing that because he was acting at the authorized direction of a federal officer, he was similarly immune from prosecution under the Supremacy Clause. On June 30, 2004, the district court held a combined hearing on the motions to vacate removal and the motions to dismiss. On July 16, 2004, the district court issued an order denying the motions to vacate and granting both motions to dismiss.

The State of Wyoming appeals, raising two arguments. First, it contends that the district court erred by denying the motion to vacate removal because the district court did not hold an evidentiary hearing prior to ordering the removal. Second, it argues that the grant of Supremacy Clause immunity was improper because there were contested issues of fact that were material to whether the actions of the Defendants were necessary and proper to carry out their authorized duties.

Before the district court and at appellate oral argument, Wyoming argued that a grant of Supremacy Clause immunity was inappropriate for Mr. Livingston because he was a federal contractor rather than a federal employee. However,

Wyoming did not address this issue in its opening appellate brief. The issue is therefore waived. *See Lifewise Master Funding v. Telebank*, 374 F.3d 917, 927 n.10 (10th Cir. 2004) (noting that an appellant waives the right to appeal any rulings of the district court that it did not address in its opening appellate brief); Fed. R. App. P. 28(a)(9)(A) (requiring that an appellant's brief contain an argument that includes "appellant's contentions and the reasons for them"). Accordingly, for purposes of this case, we will treat Mr. Livingston as if he were a federal officer.

## II. Applicable Law

*A.*     *The Development of Supremacy Clause Immunity*

The framers of the American federal system expected the federal and state governments each to check the abuses of the other. *See* The Federalist No. 28, at 179 (Alexander Hamilton) (Jacob E. Cooke ed., 1961) ("[T]he General [*i.e.*, federal] Government will at all times stand ready to check the usurpations of the state governments; and these will have the same disposition towards the General Government. . . . If [the rights of the people] are invaded by either, they can make use of the other, as the instrument of redress."); The Federalist No. 51, at 351 (James Madison) ("In the compound republic of America . . . . a double security arises to the rights of the people. The [state and federal] governments will controul each other; at the same time that each will be controulled by

-11-

itself."). The flipside of this mutual checking function, however, is the danger that one level of government would improperly restrict the other, and especially that states would impede or frustrate the legitimate execution of federal law. To prevent this second evil, federal officers have long been held immune from state prosecutions for actions reasonable and necessary in the discharge of their federal responsibilities. *See, e.g.*, *In re Neagle*, 135 U.S. 1, 75 (1890); *Ohio v. Thomas*, 173 U.S. 276, 284 (1899). This immunity is rooted in the Supremacy Clause of the United States Constitution, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.

Although the Supremacy Clause explicitly refers only to the "Constitution" and "Laws," its implication is that states may not impede or interfere with the actions of federal executive officials when they are carrying out federal laws. As Chief Justice John Marshall maintained in the great case of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819), "the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." It is not necessary for Congress to

provide expressly for such immunity in the statutes under which federal officials act; Supremacy Clause immunity is "incidental to, and is implied in the several acts by which these [federal] institutions are created, and is secured to the individuals employed in them, by the judicial power alone." *Osborn v. Bank of United States*, 22 U.S. (9 Wheat.) 738, 865-66 (1824) (Marshall, C.J.).

The Supreme Court's leading case on Supremacy Clause immunity is *In re Neagle*, 135 U.S. 1 (1890), in which the Court held that a deputy marshal was immune from state prosecution for murder when he killed a man he suspected was about to stab Justice Stephen Field. While Justice Field was riding circuit in 1888, two of the litigants, former California Chief Justice David Terry and his wife, Sarah Terry, erupted in a violent outburst. *Id.* at 44-45. Mr. Terry punched one of the marshals, knocking out his tooth, and then pulled a bowie knife from inside his vest; Mrs. Terry attempted to draw a handgun from her handbag. *Id.* at 45-46. The Terrys were removed from the courtroom and sentenced to prison for contempt of court. *Id.* at 45. Undeterred by their contempt sentence, the Terrys issued threats against Justice Field that were "open, frequent, and of the most vindictive and malevolent character." *Id.* at 46. In response, the Attorney General assigned Deputy United States Marshal David Neagle to accompany Justice Field for his protection on his return to circuit duty in California in 1889. *Id.* at 51-52. Mr. Neagle was given special instructions to "attend upon Judge

Field both in court and while going from one court to another, and protect him from any assault that might be attempted upon him by [the] Terry[s]." *Id.* at 52.

Justice Field, accompanied by Mr. Neagle, was traveling by railway from Los Angeles to San Francisco when the Terrys boarded the train in Fresno. *Id.* Justice Field was in the dining car when he encountered the truculent couple. *Id.* at 52. Mrs. Terry left the dining car to obtain a revolver while Mr. Terry assaulted Justice Field with his fists. *Id.* at 52-53. Mr. Neagle pointed his gun at Mr. Terry and cried out, "Stop! Stop! I am an officer!," whereupon Mr. Terry reached into his clothing as if to pull out a weapon. *Id.* at 53. Mr. Neagle shot him twice, killing him instantly. *Id.* It turned out that Mr. Terry had no weapons on his person. *Id.* Mr. Neagle was charged with murder under California law in the County of San Joaquin. *Id.* at 5. While a prisoner awaiting trial, he sought and obtained from the federal court a writ of habeas corpus, which was affirmed by the court of appeals and appealed to the Supreme Court by the Sheriff of San Joaquin County. *Id.* at 3.

The Supreme Court held that Mr. Neagle was entitled to habeas corpus relief because he was acting under authority of the law of the United States, and thus he was "not liable to answer in the courts of California on account of his part in that transaction." *Id.* at 76. As a preliminary matter, the Court held that any defenses Mr. Neagle might have under state law were not relevant to the federal

court proceeding. Although "such [defenses] would be a proper subject for consideration on a trial of the case for murder in the courts of the state of California," the Court explained, "there exists no authority in the courts of the United States to discharge the prisoner . . . unless there be found in aid of the defense of the prisoner some element of power and authority asserted under the government of the United States." *Id.* at 54.

The Court then considered whether Mr. Neagle's defense stemmed from the exercise of federal authority. It rejected the argument that Mr. Neagle's conduct was unauthorized because no act of Congress expressly empowered marshals to accompany Supreme Court justices through their circuits, to serve as their bodyguards, and to defend them from assaults. *Id.* at 58. In doing so, the Court explained that it is appropriate to "extend in a liberal manner the benefit of the writ of *habeas corpus* to persons imprisoned for the performance of their duty." *Id.* Ultimately, the Court derived federal power and authority for Mr. Neagle's conduct from the Attorney General's authorization of a detail of marshals to protect Justice Field during his trip to California. *Id.* at 67-68.

After ascertaining that Mr. Neagle was authorized to protect the life of a Supreme Court Justice, the only remaining inquiry was whether he did "no more than what was necessary and proper" to carry out that duty. *Id.* at 75. Given the past behavior of the Terrys, the Court concluded that Mr. Neagle's belief that

Justice Field's life was in danger was "well-founded"and his actions "justified." *Id.* at 76. Accordingly, the Court held that it was necessary and proper for him to use lethal force against Mr. Terry, and affirmed the grant of habeas corpus. *Id.*

The Court reaffirmed the principles of *Neagle* in *Ohio v. Thomas*, 173 U.S. 277 (1899). An Ohio statute, presumably pressed by dairy farmers, required any establishment serving or using oleomargarine to prominently display that fact on a large placard. *Id.* at 278. In disregard of this vital labeling law, the eating house at the Central Branch of the National Home for Disabled Volunteer Soldiers impetuously served oleomargarine without advertisement. *Id.* Unwilling to countenance this affront to its laws, the State of Ohio indicted Mr. Thomas, the governor in charge of the eating house. *Id.* at 277. Mr. Thomas was convicted of the offense and the court ordered him imprisoned until he paid a $50 fine; he refused to pay, and instead filed a writ of habeas corpus in the Southern District of Ohio, which the court granted. *Id.* at 280. The Sixth Circuit affirmed and Ohio appealed to the Supreme Court. The Court affirmed on the grounds that the eating house was a federal facility and Mr. Thomas had authorization from the Secretary of War to serve oleomargarine to his charges. *Id.* at 282. This holding gives grants of federal authority a generous sway. Mr. Thomas was not prosecuted for serving oleomargarine, but for failing to notify patrons he was doing so. This requirement was not incompatible with Mr. Thomas's federal

-16-

authorization to serve oleomargarine; Mr. Thomas could have complied with the state law without shirking his federal duty. Nevertheless, the Court concluded that the grant of federal authority was sufficient not only to permit serving oleomargarine, but to prevent Ohio from regulating the manner and circumstances of service as well.

In both *Neagle* and *Thomas* it was apparent that the federal officers had acted reasonably in discharging their duties. However, in *United States ex rel. Drury v. Lewis*, 200 U.S. 1 (1906), the Court was confronted with the question whether Supremacy Clause immunity applies when it is unclear whether officers acted reasonably. *Drury* involved a state prosecution of two soldiers charged with murdering a civilian. *Id.* at 2. The soldiers claimed that the shooting was lawful because the suspect was in flight; witnesses testified that the soldiers had shot the victim after surrender. *Id.* at 3-4. A federal circuit court refused to grant a writ of habeas corpus to the soldiers at an early stage in the litigation. *Id.* at 6. The Court affirmed, noting that only "exceptional" cases warrant exercise of the "exceedingly delicate" jurisdiction of federal courts to usurp state prosecutions, and finding that the circuit court properly exercised its discretion not to issue the writ in advance of trial given the conflicting evidence about whether the killing was lawful. *Id.* at 7-8.

The contrast between *Lewis* and *Neagle* clarifies the key inquiry in early

Supremacy Clause immunity cases: given the undisputed facts of a case, was the

federal officer reasonably discharging his authorized federal duties?  If so, then a

grant of habeas corpus is appropriate in advance of trial.  If not, then the state

court prosecution may proceed, leaving as recourse a post-conviction habeas

petition if the result is adverse.

B.      *Supremacy Clause Immunity Doctrine in the Lower Federal Courts*

The Supreme Court has decided no Supremacy Clause immunity case since

1920.  *See Johnson v. Maryland*, 254 U.S. 51 (1920).  Modern Supremacy Clause

immunity doctrine has thus largely been developed in the lower federal courts.  In

*Clifton v. Cox*, 549 F.2d 722, 724 (9th Cir. 1977), the Ninth Circuit considered

whether a special agent for the Bureau of Narcotics and Dangerous Drugs was

entitled to immunity for a killing that occurred during a drug raid.  After finding

that the federal agent's acts were within the scope of his authority, the court went

on to consider whether the agent's conduct "was necessary and proper under the

circumstances."  *Id.* at 728.  The Ninth Circuit explained the "necessary and

proper" standard as follows:

> Determination of whether petitioner's shooting . . . was necessary
> and proper . . . must rest not only on the subjective belief of the
> officer but also on the objective finding that his conduct may be said
> to be reasonable under the existing circumstances.  Proper
> application of this standard does not require a petitioner to show that

-18-

his action was in fact necessary or in retrospect justifiable, only that
he reasonably thought it to be.

*Id.* The Ninth Circuit incorporated a subjective element into the "necessary and

proper" analysis. It explained that "'if . . . petitioner shows . . . that he had an

honest and reasonable belief that what he did was necessary in the performance of

his duty . . . then he is entitled to the relief he seeks.'" *Id.* at 729 (quoting *In re*

*McShane's Petition*, 235 F. Supp. 262, 274 (N.D. Miss. 1964)).

In *Kentucky v. Long*, 837 F.2d 727 (6th Cir. 1988), the Sixth Circuit framed

the Supremacy Clause immunity analysis in a similar fashion. The court

explained:

> [A] two-part test determines whether or not a state court has
> jurisdiction to prosecute a federal agent for conduct facially violative
> of a state's criminal code. Under *Neagle*, a state court has no
> jurisdiction if (1) the federal agent was performing an act which he
> was authorized to do by the law of the United States and (2) in
> performing that authorized act, the federal agent did no more than
> what was necessary and proper for him to do.

*Id.* at 744. As to whether an act was "necessary and proper," the Sixth Circuit,

citing *Clifton*, stated that a federal officer must "only show that he reasonably

thought it to be necessary and justifiable." *Id.* at 745. The court also included

*Clifton*'s subjective element, which requires the agent to "have an honest belief

that his action was justified." *Id.* The Second Circuit has adopted a similar

approach. *See New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004); *Whitehead*

*v. Senkowski*, 943 F.2d 230, 234 (2d Cir. 1991) ("[T]he agent must have a

-19-

subjective belief that his conduct was justified, and that belief must be objectively reasonable.").

Although we agree with the general Supremacy Clause immunity analysis set forth in *Clifton* and *Long*, we are hesitant to adopt the "necessary and proper" label as it may engender unnecessary confusion with the familiar Necessary and Proper Clause of Article I, Section 8, Clause 18.[4]  The "necessary and proper" language is derived from *Neagle*, where the Court said,

> if the prisoner is held in the state court to answer for an act which he was *authorized to do by the law of the United States*, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was *necessary and proper* for him to do, he cannot be guilty of a crime under the law of the state of California.

*In re Neagle*, 135 U.S. at 75 (emphasis added).  However, the *Neagle* Court also used other language to describe its analysis.  In explaining its grant of habeas

---

[4]McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 421 (1819), provides the canonical exposition of the meaning of "necessary and proper": "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."  This cannot be the definition of Supremacy Clause immunity because it would imply that federal officers are virtually unlimited in their choice of appropriate means (including violation of state law) to carry out federal policy.  As the cases demonstrate, that is too broad an understanding of the immunity.  While federal officers sometimes are entitled to immunity for violations of state law, this is only where they had an objectively reasonable and well-founded basis to believe that their conduct was necessary for the performance of their federal duties, which entails a more demanding judicial scrutiny of the relation of means to ends than is appropriate under the Necessary and Proper Clause.

relief, the Court emphasized that "Neagle was *correct* in the belief that, without prompt action on his part, the assault of Terry upon the judge would have ended in the death of the latter; [and] that, such being his *well-founded belief*, he was *justified* in taking the life of Terry." *Id.* at 76 (emphasis added). As other circuits have found, the Court in *Neagle* was granting immunity for federal agents who *reasonably* believed that their acts were *necessary* to perform their duties. Because it is equally appropriate and less confusing to label the second part of the Supremacy Clause immunity analysis "reasonable and necessary," we will use that language wherever possible throughout the remainder of this opinion.

We are also concerned with the incorporation of a subjective element into the reasonableness of a federal officer's actions, an element that was not present in the Supreme Court's decisions. The subjective element first appeared in district court decisions in the mid-twentieth century. In *Brown v. Cain*, 56 F. Supp. 56, 58 (E.D. Pa. 1944), and *McShane*, 235 F. Supp. at 274, the courts held that a federal officer must have an "honest[]" belief that his actions are reasonable and necessary to the exercise of his authority. Although most circuit courts have adopted the subjective approach without analysis, the en banc Ninth Circuit has recently questioned whether inclusion of a subjective component is appropriate in light of the Supreme Court's decision in *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982), which held that qualified immunity should depend on

whether the official acted in an objectively reasonable manner, without reference to subjective intentions. *Idaho v. Horiuchi*, 253 F.3d 359, 366 n.11 (9th Cir. 2001) (en banc), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001) (en banc).

Although qualified immunity and Supremacy Clause immunity have different sources and functions, there is a functional similarity between these two doctrines. Both qualified immunity and Supremacy Clause immunity reduce the inhibiting effect that a civil suit or prosecution can have on the effective exercise of official duties by enabling government officials to dispose of cases against them at an early stage of litigation. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) ("[D]amages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties."); *Long*, 837 F.2d at 752 (analogizing Supremacy Clause immunity to qualified immunity and concluding that in both situations, courts have a duty to make early rulings on immunity issues to avoid excessive interference with official actions). Just as the Supreme Court jettisoned the subjective element of the qualified immunity test because it was incompatible with the goal of promptly determining whether qualified immunity was appropriate on a motion for summary judgment, *Harlow*, 457 U.S. at 815-819, it may also be appropriate to reject a subjective element of the Supremacy Clause immunity test. Nonetheless, because Wyoming

-22-

does not dispute that both Mr. Jimenez and Mr. Livingston subjectively believed they were on federal land, we need not now decide whether a federal officer's subjective intent factors into the determination of whether an action was reasonable and necessary.

In harmony with the Second, Sixth, and Ninth Circuits, we hold that a federal officer is not entitled to Supremacy Clause immunity unless, in the course of performing an act which he is authorized to do under federal law, the agent had an objectively reasonable and well-founded basis to believe that his actions were necessary to fulfill his duties. We leave for another day the question whether that belief must be both subjectively and objectively reasonable.[5]

C.    *Congressional Protection of Federal Actors: Federal Officer Removal Statutes*

Related to the judicially created Supremacy Clause immunity doctrine are federal officer removal statutes. Like Supremacy Clause immunity, federal officer removal statutes are designed to protect the operations of the federal government from state interference. Despite their similarities, the principles are distinct. Supremacy Clause immunity, when properly established, provides an

---

[5]We also leave for another day whether federal officers are entitled to Supremacy Clause immunity where their state law violation was disproportionate to the federal policy they were carrying out – where, for example, they commit a grievous state offense for the purpose of enforcing a trivial federal policy. Wyoming has not argued that its laws against trespassing and littering are so significant that they outweigh the federal interest in wolf monitoring.

absolute immunity to prosecution. *See Neagle*, 135 U.S. at 75; *Long*, 837 F.2d at 752. Federal officer removal statutes, in contrast, provide federal officers with a federal forum for the entire trial, including determinations of guilt or innocence as well as the applicability of official immunity. This protects against the possibility of a hostile state forum, which might arise when the federal officer is enforcing a locally unpopular national law. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."); *Tennessee v. Davis*, 100 U.S. (10 Otto) 257, 263 (1880) ("[The federal government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offense against the law of the State . . . the operations of the general government may at any time be arrested at the will of one of its members."). Although early Supremacy Clause immunity cases were based on habeas corpus statutes that provided for a grant of the writ where officers acted under the authority of federal laws,[6] such cases now usually

---

[6] There is one notable exception to this pattern of reviewing grants of habeas corpus. In *Johnson v. Maryland*, 254 U.S. 51, 57 (1920), the Court reversed a Maryland conviction of a post office employee for driving without a Maryland license. In a brief opinion reviewing the conviction on direct appeal, Justice Holmes concluded that immunity was appropriate for the employee and thus the conviction and fine were invalid. *Id.*

arise on motions to dismiss after the case has been removed to federal court. *See Long*, 837 F.2d at 730; *Horiuchi*, 253 F.3d at 364; *Tanella*, 374 F.3d at 142. Not all cases involving prosecutions of federal officers, however, permit of removal, *see Mesa v. California*, 489 U.S. 121, 139 (1989), and the history of cases involving federal officer removal statutes demonstrates the circumstances under which removal is appropriate.

Although they have not always taken their present form, federal officer removal statutes have long been a part of this country's history. The first removal provision was enacted as part of an 1815 customs statute, which attempted to enforce, over the opposition of New England states, an embargo on trade with England. *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). The removal statute "allowed federal officials involved in the enforcement of the customs statute to remove to the federal courts any suit or prosecution commenced because of any act done 'under colour' of the statute." *Id.* The 1815 removal statute expired at the end of the war, but a new removal statute protecting federal officers who were enforcing customs laws was passed in 1833 in response to South Carolina's threats of nullification. *Id.* With the Civil War came other removal statutes, authorizing removal of civil suits and criminal prosecutions arising out of enforcement of federal revenue laws. *Id.* at 405-06.

These early removal statutes were often met with constitutional challenges, based on the theory that the cases did not arise under the Constitution or laws of the United States, and thus were outside the scope of Article III. *Mayor v. Cooper*, 73 U.S. (6 Wall.) 247, 248 (1868), involved civil claims against the mayor and alderman of Nashville, Tennessee (who were appointed under the authority of the President by the then military governor of Tennessee) for trespass and conversion of chattels occurring during or shortly after the Civil War. The federally appointed city officials sought removal to federal court; Cooper opposed, claiming that the removal statute violated Article III of the Constitution. *Id.* at 249. The Court upheld the removal statute's constitutionality, observing that averment of one federal defense was sufficient to confer federal jurisdiction, even if the remainder of the case was premised exclusively on state law. *Id.* at 252-54.

*Tennessee v. Davis*, 100 U.S. at 262, provided the Court with its first opportunity to consider the constitutionality of removal of state criminal prosecutions. There, the State of Tennessee prosecuted a federal revenue collector for murder. The federal officer claimed that "he was assaulted and fired upon by a number of armed men" while he was in the act of seizing an illegal distillery, "and that in defence of his life he returned the fire" and killed an assailant. *Id.* at 261. As in *Cooper*, the federal officer sought to remove the

prosecution to federal court and the State claimed the removal statute was unconstitutional. In finding that the case "arise[s] under the Constitution or a law or a treaty of the United States," the Court examined whether the case turned on the construction of federal law. *Id.* at 264. The revenue collector's defense was self-defense. The legitimacy of that defense turned on whether the officer had the authority to seize the distillery—a question of federal law. *See id.* at 265; *Mesa*, 489 U.S. at 127-28 (explaining that in *Davis*, "[p]roof that Davis was not a thief depended on the federal revenue laws and provided the necessary predicate for removal"). The early removal statutes at issue in *Cooper* and *Davis* were therefore constitutional because removal was predicated on the existence of a federal defense. *See Mesa*, 489 U.S. at 128-29.

In 1948, Congress extended the early, limited removal statutes to cover all federal officers. *See* Act of June 25, 1948, ch. 646, 62 Stat. 869, 938 (codified as amended at 28 U.S.C. § 1442(a)). The new federal officer removal statute provides, in relevant part:

> A civil action or criminal prosecution commenced in a State court
> against any of the following may be removed by them to the district
> court of the United States for the district and division embracing the
> place wherein it is pending:
>> (1) The United States or any agency thereof or any officer (or
>> any person acting under that officer) of the United States or of
>> any agency thereof, sued in an official or individual capacity
>> for any act under color of such office or on account of any
>> right, title or authority claimed under any Act of Congress for

-27-

the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a). This statute reflects Congress's determination that "federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham*, 395 U.S. at 407. The Supreme Court has therefore construed the statute as "not 'narrow' or 'limited'" but rather "broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Id.* at 406-07 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)).

Although the language of the statute seems to permit removal of state criminal prosecutions whenever a federal officer is sued or prosecuted for an act under color of his federal office, the Supreme Court has confined the statute to cases where the officer alleges a colorable federal defense for the act. *Mesa*, 489 U.S. at 139. Removal is appropriate, for example, where the federal officer alleges Supremacy Clause immunity as a defense.

### III. Discussion

*A.    Removal*

Wyoming does not dispute that this case involves a federal officer prosecuted for acts under the color of federal office, nor that Defendants Jimenez and Livingston have colorable federal defenses based on Supremacy Clause immunity. The State does argue, however, that removal was procedurally

-28-

improper, in that the district court failed to hold an evidentiary hearing prior to denying the State's motion to vacate. The removal statute provides that "[i]f the United States district court does not order the summary remand of [a criminal] prosecution, it *shall* order an evidentiary hearing to be held promptly and *after such hearing* shall make such disposition of the prosecution as justice shall require." 28 U.S.C. § 1446(c)(5) (emphasis added). The district court concluded that an evidentiary hearing is not necessary when there is no dispute about the facts that permit removal. The State argues that this violates the plain text of the statute, and urges this Court to reverse the decision below and remand to the district court with instructions to hold the required evidentiary hearing.

The district court's decision that no evidentiary hearing was required may seem to be commonsensical. There is no need for a court to hold an evidentiary hearing in a matter when there are no material facts in dispute. *Cf. Scrivner v. Tansy*, 68 F.3d 1234, 1242 (10th Cir. 1995) ("If no facts are disputed [in a habeas petition] and the issues can be resolved on the basis of the record and the law, no evidentiary hearing is required."). But we hesitate to affirm on that ground, both because the text of § 1446(c)(5) is unequivocal and because, at the time the district court ordered removal of the state prosecution, it did not yet have the benefit of any responsive pleading from Wyoming. Section 1442(a)(1) requires a substantial factual showing to justify removal, and comity demands that federal

-29-

courts dot their i's and cross their t's before taking the serious step of removing a state criminal prosecution to federal court. *See Mesa*, 489 U.S. at 138 (stressing the "strong judicial policy against federal interference with state criminal proceedings") (internal quotation marks omitted). In order for removal under § 1442(a)(1) to be appropriate, a federal officer (or someone acting under him) must not only show that he is being prosecuted for the manner in which he carried out his federal duties, but must also demonstrate that there exists a colorable federal defense for the act. *See id.* at 139. There will be cases, like *Mesa* itself, when federal officers sued or prosecuted for official acts are not entitled to removal. Courts must be careful not to remove state criminal prosecutions to federal court on the basis of "ominous intimations of hostile state prosecutors and collaborationist state courts interfering with federal officers by charging them with traffic violations and other crimes for which they would have no federal defense in immunity or otherwise." *Id.* at 138. Removal under § 1442(a)(1) is not a mere formality.

In this case the district court ordered removal without giving Wyoming an opportunity to contest the factual basis for removal. This practice violated the technical requirements of 28 U.S.C. § 1446(c)(5) and might conceivably have affected the nature of the inquiry required by § 1442(a)(1). The court had little before it other than Mr. Jimenez's motion for removal and the Affidavit of

Probable Cause, on which the Wyoming prosecution was based. The Affidavit of Probable Cause stated that "a United States Fish and Wildlife employee along with another person had trespassed on private deeded land in the furtherance of capturing and/or releasing wolves." Jimenez App. 20. Although the State's apparent admission, in this Affidavit, that the trespass was "in the furtherance of" the federal policy of wolf capture and release suggests the likelihood of a Supremacy Clause immunity defense, that admission may not be sufficient, without more, to establish a colorable federal defense. Consistent with the language of the Affidavit of Probable cause, it might have been possible, for example, that Mr. Jimenez's trespass represented a mere cutting of corners or carelessness, not reasonably necessary for the wolf capturing operation. We need not determine whether the district court's decision to forego an evidentiary hearing was legal error, however, because we find that any error was without a doubt harmless.

We now know that there were no material facts in dispute. It is undisputed that Defendants Jimenez and Livingston were federal officials,[7] and likewise undisputed that they have a colorable federal defense. That is all that is required

_____

[7]As noted above, although Mr. Livingston was a federal contractor rather than a federal official, the State waived any argument that he is not covered within the terms of either the removal statute or the doctrine of Supremacy Clause immunity.

for removal under § 1442(a)(1). In its briefs before this Court, the State has identified no disputed factual question relevant to removal, and appears concerned only with the formalities. In our view, to reverse and remand to the district court for an evidentiary hearing (on nothing), as the State requests, would be a colossal waste of time and resources.[8]

The Defendants-Appellees have not expressly argued that the district court's error, if any, was harmless. We may nonetheless address harmless error *sua sponte* if three conditions are met: (1) the record is not overly long or complex; (2) the harmlessness is not debatable; (3) reversal would result in futile and costly proceedings in the district court. *See United States v. Samaniego*, 187 F.3d 1222, 1224-25 (10th Cir. 1999). This case satisfies all three requirements: the record is short, there is no serious doubt about the harmlessness, and a remand for an evidentiary hearing would be futile. Accordingly, we hold that the failure to conduct an evidentiary hearing, whether or not error, was harmless. We do urge district courts when facing a motion for removal under § 1442(a)(1) to ensure that the State has an adequate opportunity to identify any disputed issues

---

[8]Wyoming does not argue that the evidentiary hearing requirement of § 1446(c)(5) is jurisdictional, and it is not. It is well settled that parties may stipulate to a waiver of the evidentiary hearing, which would not be permitted if holding the hearing were a jurisdictional requirement. *See Long*, 837 F.2d at 730.

of fact relevant to removal, and to conduct an evidentiary hearing to resolve them, before acting on the motion.

B.      *Supremacy Clause Immunity*

1.      *Standard of Review*

Having established that the district court properly removed the Wyoming prosecution to federal court, we must now consider whether the district court properly held that the Defendants are entitled to Supremacy Clause immunity. Supremacy Clause immunity dismissals present a mixed question of law and fact and are reviewed de novo. *Tanella*, 374 F.3d at 146. The appellate court must review the evidence in the light most favorable to the non-moving party and assume the truth of the allegations in the indictment. *Id.* at 148. However, once a defendant raises the defense of Supremacy Clause immunity the burden shifts to the state to supply sufficient evidence to raise a "*genuine* factual issue" that is supported by more than mere allegations. *See Long*, 837 F.2d at 752. The parties do not dispute these standards, which we believe are appropriate for a review of a motion to dismiss on Supremacy Clause immunity grounds.

When the district court grants Supremacy Clause immunity on a motion to dismiss, we review the district court's decision by asking two questions: (1) Whether the federal officer had authority for his acts under the Constitution or the laws of the United States; and (2) whether there is a disputed issue of fact bearing

on whether the federal officer had an objectively reasonable and well-founded basis to believe that the indicted acts were necessary to carry out his duties.[9]

2.      *Federal Authorization*

The first question is whether the Defendants had federal authorization for their acts on February 14, 2004. Mr. Jimenez and Mr. Livingston were acting under regulations promulgated pursuant to the Endangered Species Act, which authorizes the designation of nonessential experimental populations of endangered and threatened species and permits the promulgation of rules governing the management of these populations. 16 U.S.C. § 1539(j). The gray wolf was listed as an endangered species in 1978 in the lower 48 states except Minnesota. Reclassification of the Gray Wolf in the United States and Mexico, with Determination of Critical Habitat in Michigan and Minnesota, 43 Fed. Reg. 9607 (Mar. 9, 1978). In 1994, the Secretary of the Interior adopted a gray wolf recovery program that provided for the annual reintroduction of fifteen wolves in Yellowstone National Park and central Idaho. *Wyo. Farm Bureau Fed'n v. Babbitt*, 199 F.3d 1224, 1228-29 (10th Cir. 2000). The Department of the Interior published final rules authorizing the USFWS to manage gray wolf populations in

---

[9]We note that denying a motion to dismiss does not foreclose a grant of Supremacy Clause immunity at a later stage in the litigation. If a court denies a motion to dismiss because there are genuine issues of fact to resolve, the resolution of those facts could demonstrate that Supremacy Clause immunity is appropriate. *See, e.g.*, *Johnson*, 254 U.S. at 56-57.

the Yellowstone Management Area. 50 C.F.R. § 17.84(i)(7)(ii).[10] The regulations

designate all of Wyoming, as well as parts of Idaho and Montana, as the

boundaries of the nonessential experimental population area for the Yellowstone

Management Area. *Id.* The final regulations are intended to give the

reintroduced gray wolves an opportunity to thrive while at the same time mitigate

the concerns of ranchers about livestock predation. For example, ranchers may

take nonlethal measures to harass wolves on their property, *id.* § 17.84(i)(3)(i),

and may kill wolves that are actively attacking their livestock, *id.* §

17.84(i)(3)(ii).

The regulations do not merely authorize, but impose an obligation on the

USFWS to monitor wolves. *Id.* §17.84(i)(8) ("The reintroduced wolves will be

monitored during the life of the project . . . ."). This monitoring regulation is

important because it provides direct federal authorization for the actions of the

Defendants.

We note, however, that the regulation does not contain an explicit grant of

authority for USFWS staff to trespass. The regulations that do address private

land do not state whether USFWS officials need to secure permission from

landowners before operating on their land. For example, in a section addressing

---

[10]Since the acts at issue in this prosecution, the Department of the Interior
has updated the gray wolf regulations. *See* 70 Fed. Reg. 1286-01 (Jan. 6, 2005).
We focus on the regulations in effect at the time of the relevant acts.

problem wolves that have attacked livestock, USFWS staff have the authority to relocate "[a]ll wolves on private land" to "other areas within the experimental population area if continued depredation occurs." *Id.* § 17.84(i)(3)(vii). The lack of any reference to the permission of the land owner distinguishes these regulations from those governing the reintroduction of other species. For example, the Mexican gray wolf regulations state: "If any wolves move onto private land outside the designated recovery area(s), but within the Mexican Wolf Experimental Population Area, the Service or an authorized agency will develop management actions in cooperation with the landowner including capture and removal of the wolf or wolves if requested by the landowner." *Id.* § 17.84(k)(11). We are hesitant to read too much into the differences between this language and the gray wolf regulations, but there is a plausible inference that USFWS staff acting pursuant to the gray wolf regulations have a slightly freer hand when working on private land than those acting pursuant to the Mexican wolf regulations.

In any event, Supremacy Clause immunity does not require that federal law explicitly authorize a violation of state law. The Supreme Court found federal authorization in *Neagle* despite the fact that the Attorney General's order did not explicitly authorize the use of lethal force, and in *Thomas* even though the federal oleomargarine provision did not authorize violation of Ohio's notice requirement.

-36-

The question is not whether federal law expressly authorizes violation of state law, but whether the federal official's conduct was reasonably necessary for the performance of his duties. Accordingly, there is no question that the Defendants had federal authorization for the capture and collar operation that led to their indictments.

*3.    Reasonable and Necessary*

Having determined that the Defendants had federal authorization for their conduct, we next ask whether Mr. Jimenez and Mr. Livingston had an objectively reasonable and well-founded basis to believe that their actions were necessary to carry out their duties. Because the State does not dispute that the federal agents subjectively believed their actions were necessary, we consider only whether that belief was well-founded and objectively reasonable. As mentioned earlier, we decline to consider whether subjective reasonableness is a necessary consideration in Supremacy Clause immunity cases.

It is undisputed that tracking the Washakie pack was a difficult enterprise. Extensive forest cover and frequent windy conditions in the home range of the wolves make it difficult for the USFWS to attend to the duty to monitor the wolves on their own turf. It is also uncontested that the spotting of the pack far outside of its normal range on February 13, 2004, presented unusually favorable conditions for the Defendants to capture and collar the wolves. Given the

difficulty of tracking the wolves there is no question that it was objectively reasonable for the Defendants to believe that taking advantage of this opportunity was necessary to carry out their duty to monitor the wolves.

The more difficult question is the reasonableness of their decision to immobilize the wolves and place them on land that might turn out to be private. The Defendants do not argue that federal law gives them a right to trespass with impunity when pursuing wolves, nor do they argue that when exigent circumstances exist there is a limited right to trespass. Thus, we need not consider those arguments. The record, including declarations from cattle ranchers hostile to the wolf program, shows that Mr. Jimenez is conscientious about securing permission from land owners when he knows he might be on their land. Rather, the Defendants argue that they made reasonable attempts to determine whether they were on private land in this case and that there were no indications, such as signage or fences, that they were on private land.[11] Thus, the Defendants contend, there were objective reasons to believe that they were not on private

_____

[11] Under Wyoming law, unauthorized presence on private land constitutes criminal trespass only when the defendant enters or remains "knowing he is not authorized to do so, or after being notified to depart or to not trespass." Wyo. Stat. § 6-3-303(a). On the facts of this case, therefore, the Defendants would seem to have a plausible defense under state law. The question for purposes of Supremacy Clause immunity, however, is not whether the federal official is guilty under state law, but whether he has established immunity under federal law. *Neagle*, 135 U.S. at 54. It is logically possible for an indicted federal official not to be immune, but to be not guilty.

land.  *See Texas v. Carley*, 885 F. Supp. 940, 945-46 (W.D. Tex 1994) (granting a motion to dismiss on Supremacy Clause immunity grounds to a USFWS employee indicted for trespass, where the officer had no indication that the land was private).  It is not clear to us that the Defendants would have lacked an objectively reasonable basis to believe their actions were necessary to the performance of their functions, even if they had been aware they were on private land.  But their claim of immunity is based on that lack of awareness, and we therefore address the issues in those terms.

Wyoming counters that there were signs in the area and that the GPS coordinates from the helicopter indicated that each discharge of a dart or net was over private land.  Wyoming argues that this evidence was sufficient to create a question of fact as to whether the Defendants' belief that they were on public land was objectively reasonable.

We believe the undisputed evidence in the record establishes that the Defendants' belief that they were on private land was objectively reasonable and well-founded.  Given the expansive range of gray wolves as well as their propensity to run in any direction after being darted, it would be an onerous burden on federal officers like Mr. Jimenez to require them to determine the precise boundaries of land that *might* be encountered, on threat of criminal prosecution if they should be in error.  *Cf. Davis*, 100 U.S. at 263 (warning that

state interference with federal law may "paralyze the operations of the government"). The undisputed evidence shows that the area in which this wolf collaring operation took place is a jumble of federal, state, and private land. Mr. Jimenez consulted both the fixed-wing pilot and the helicopter pilot in advance of the operation and secured their opinion that the operation would take place on public land. It is likewise undisputed that the location where Mr. Jimenez processed the wolves was close to a county road, and that it took the specialized skills of state surveyors to determine that the operation extended beyond the county right-of-way for the road. There were neither fences nor signs between the road and the processing location, though there were some signs in the distance. Moreover, when Mr. Kruger, a part owner and employee of the Larsen Ranch, came by he chatted amicably with Mr. Jimenez and offered no indication that Mr. Jimenez and Mr. Livingston were trespassing on Ranch property.

Wyoming law treats the presence of a person on the private land of another as criminal trespass only when he enters or remains "knowing he is not authorized to do so, or after being notified to depart or to not trespass." Wyo. Stat. § 6-3-303(a). Notice may be provided in two ways: "(i) Personal communication to the person by the owner or occupant, or his agent, or by a peace officer; or (ii) Posting of signs reasonably likely to come to the attention of intruders." *Id.* A reasonable person operating on what might be private land in the State of

Wyoming would presumably be on alert for these two types of notice, and would interpret their absence as an indication he was not trespassing. In particular, the Defendants' encounter with Mr. Kruger would induce reasonable persons to believe either that they were not on Ranch property or that he acquiesced to their presence.

The State argues that there are some uncontested facts that suggest that the Defendants should have known they were on private land. For example, the parties do not contest that when one of the Defendants fired a dart or net from the helicopter, the pilot would press a button to lock in the GPS coordinates at the time. The parties also do not dispute that comparing these coordinates to a detailed map of the area shows that each time the pilot locked in coordinates the helicopter was over private land. Wyoming asserts that this information creates an issue of genuine fact as to whether the officers were objectively justified in their belief that they were operating on public land. We disagree. Supremacy Clause immunity cases require courts to evaluate the circumstances as they appear to federal officers at the time of the act in question, rather than the more subtle and detailed facts later presented to a court. *See Neagle*, 135 U.S. at 76. At the time the pilot locked in the coordinates, the Defendants were manning a net gun and dart gun on a helicopter that had no doors. These circumstances made consulting a map difficult, if not impossible. At most, the GPS coordinates could

have enabled the Defendants, after the fact, to determine where they had been when they encountered the wolves, but this could not have provided information regarding land ownership during real time. Moreover, the GPS coordinates are thin evidence of trespass because the helicopter did not land at these points and the wolves did not immediately go down after being hit. Even if objective reasonableness required on-the-fly cross-referencing of the GPS data with map data, which we do not believe it does, the GPS data would only demonstrate that the helicopter stage of the operations took place over, but not on, private land.

Wyoming also argues that the district court ignored evidence submitted about the signage and structures in the area where Mr. Kruger encountered the Defendants. Wyoming contends that these indications could have alerted the Defendants that they were on private land, creating a disputed factual question. There are two flaws in this argument. First, it is uncontested that the structures were not in the immediate vicinity of the Defendants while they were tending to the wolves. Structures and fences in the distance suggest only that the area off in the distance is private land and say little about the area where the Defendants were dealing with the wolves. Indeed, the presence of far-off structures and fences may reenforce the impression that an unfenced, unsigned area adjoining a public road is not private. We find it significant that the County had to hire professional surveyors to determine whether the Defendants were on a public

right of way or on deeded private land.  Objective reasonableness does not require federal actors carrying out their duties to estimate property boundaries with a surveyor's precision, at the peril of criminal prosecution.

Second, even on the assumption that the Defendants saw or should have seen the signs identified by Wyoming, these did not provide the Defendants reason to know they were trespassing, because the signs implicitly authorize entry.  The signs contain admonitions such as: "Hunter Management Area Ends Here—Respect the Landowner and the Land," "Notice: No Off Road Vehicle Travel," "Walk-In Area. Foot Traffic Only [Except on Designated Trails]—Hunting on this land is provided for your enjoyment—Respect the Landowner And the Land," and more cryptically "No Traffic Allowed Off Lease Roads Without Permission of Landowner."  Jimenez App. 174, 176, 178.  It is reasonable to read these signs as permitting members of the public to enter the private land, and even hunt animals on that land, so long as they respect the land and do not drive vehicles off road.  If the Defendants did see these signs they would have reason to believe the signs indicated private land, but they would also have reason to believe that their presence on private land was permitted.  Thus, it does not matter whether the Defendants actually saw the signs.  In either case they would have a well-founded basis to believe that they were not committing

criminal trespass, and thus that their entry on the land was an objectively reasonable mode of carrying out their federal duties.

Our review of the evidence presented to the district court demonstrates that while the Defendants were attempting to fulfill their federal duty to monitor the wolves through a capture and collar operation they confined their acts to an objectively reasonable view of the scope of their authority. Thus, the district court correctly granted immunity to the Defendants and correctly dismissed the indictment.[12]

## IV. Conclusion

Granting immunity in this case serves the purposes for which Supremacy Clause immunity was developed. The record evidence supports the suspicion that the prosecution of Mr. Jimenez and Mr. Livingston was not a bona fide effort to punish a violation of Wyoming trespass law, which requires knowledge on the part of a trespasser, *see* Wyo. Stat. § 6-3-303(a), but rather an attempt to hinder a locally unpopular federal program. An early grant of immunity reduces the risk that the possibility of state criminal prosecution will deter the performance by federal officers of their federal duties. For the reasons stated above, we

---

[12] The only material distinction between the conduct of Mr. Jimenez and the conduct of Mr. Livingston was Mr. Jimenez's hike of roughly a quarter mile to retrieve a darted wolf. Wyoming has not argued that this foray differed in any material way from the rest of the Defendants' activities that day.

**AFFIRM** the order of the district court denying Wyoming's motion to vacate removal and granting the Defendants' motion to dismiss.